BOWEN, SECRETARY OF HEALTH AND HUMAN
SERVICES *v.* GEORGETOWN UNIVERSITY
HOSPITAL ET AL.

No. 87–1097.   Argued October 11, 1988—Decided December 12, 1988

*Richard J. Lazarus* argued the cause for petitioner. With him on the briefs were *Acting Solicitor General Ayer, Assistant Attorney General Bolton, Deputy Solicitor General Merrill, Deputy Assistant Attorney General Spears, John F. Cordes, Mark W. Pennak, Ronald E. Robertson, Terry Coleman,* and *Henry R. Goldberg.*

*Ronald N. Sutter* argued the cause for respondents. With him on the brief were *Mary Susan Philp* and *Thomas K. Hyatt.**

JUSTICE KENNEDY delivered the opinion of the Court.

Under the Medicare program, health care providers are reimbursed by the Government for expenses incurred in providing medical services to Medicare beneficiaries. See Title XVIII of the Social Security Act, 79 Stat. 291, as amended, 42 U. S. C. § 1395 *et seq.* (the Medicare Act). Congress has

---

*Briefs of *amici curiae* urging affirmance were filed for Sisters of Mercy Health Corp. et al. by *James K. Robinson* and *Anthony A. Derezinski;* and for the American Hospital Association by *Linda A. Tomaselli* and *Robert A. Klein.*

authorized the Secretary of Health and Human Services to promulgate regulations setting limits on the levels of Medicare costs that will be reimbursed. The question presented here is whether the Secretary may exercise this rulemaking authority to promulgate cost limits that are retroactive.

I

The Secretary's authority to adopt cost-limit rules is established by § 223(b) of the Social Security Amendments of 1972, 86 Stat. 1393, amending 42 U. S. C. § 1395x(v)(1)(A). This authority was first implemented in 1974 by promulgation of a cost-limit schedule for hospital services; new cost-limit schedules were issued on an annual basis thereafter.

On June 30, 1981, the Secretary issued a cost-limit schedule that included technical changes in the methods for calculating cost limits. One of these changes affected the method for calculating the "wage index," a factor used to reflect the salary levels for hospital employees in different parts of the country. Under the prior rule, the wage index for a given geographic area was calculated by using the average salary levels for all hospitals in the area; the 1981 rule provided that wages paid by Federal Government hospitals would be excluded from that computation. 46 Fed. Reg. 33637, 33638–33639 (1981).

Various hospitals in the District of Columbia area brought suit in United States District Court seeking to have the 1981 schedule invalidated. On April 29, 1983, the District Court struck down the 1981 wage-index rule, concluding that the Secretary had violated the Administrative Procedure Act (APA), 5 U. S. C. § 551 et seq., by failing to provide notice and an opportunity for public comment before issuing the rule. See District of Columbia Hospital Assn. v. Heckler, No. 82–2520, App. to Pet. for Cert. 49a (hereinafter DCHA). The court did not enjoin enforcement of the rule, however, finding it lacked jurisdiction to do so because the hospitals

had not yet exhausted their administrative reimbursement remedies. The court's order stated:

> "If the Secretary wishes to put in place a valid prospective wage index, she should begin proper notice and comment proceedings; any wage index currently in place that has been promulgated without notice and comment is invalid as was the 1981 schedule." *DCHA*, App. to Pet. for Cert. 64a.

The Secretary did not pursue an appeal. Instead, after recognizing the invalidity of the rule, see 48 Fed. Reg. 39998 (1983), the Secretary settled the hospitals' cost reimbursement reports by applying the pre-1981 wage-index method.

In February 1984, the Secretary published a notice seeking public comment on a proposal to reissue the 1981 wage-index rule, retroactive to July 1, 1981. 49 Fed. Reg. 6175 (1984). Because Congress had subsequently amended the Medicare Act to require significantly different cost reimbursement procedures, the readoption of the modified wage-index method was to apply exclusively to a 15-month period commencing July 1, 1981. After considering the comments received, the Secretary reissued the 1981 schedule in final form on November 26, 1984, and proceeded to recoup sums previously paid as a result of the District Court's ruling in *DCHA*. 49 Fed. Reg. 46495 (1984). In effect, the Secretary had promulgated a rule retroactively, and the net result was as if the original rule had never been set aside.

Respondents, a group of seven hospitals who had benefited from the invalidation of the 1981 schedule, were required to return over $2 million in reimbursement payments. After exhausting administrative remedies, they sought judicial review under the applicable provisions of the APA, claiming that the retroactive schedule was invalid under both the APA and the Medicare Act.

The United States District Court for the District of Columbia granted summary judgment for respondents. Applying the balancing test enunciated in *Retail, Wholesale and De-*

*partment Store Union, AFL–CIO* v. *NLRB*, 151 U. S. App. D. C. 209, 466 F. 2d 380 (1972), the court held that retroactive application was not justified under the circumstances of the case.

The Secretary appealed to the United States Court of Appeals for the District of Columbia Circuit, which affirmed. 261 U. S. App. D. C. 262, 821 F. 2d 750 (1987). The court based its holding on the alternative grounds that the APA, as a general matter, forbids retroactive rulemaking, and that the Medicare Act, by specific terms, bars retroactive cost-limit rules. We granted certiorari, 485 U. S. 903 (1988), and we now affirm.

## II

It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress. In determining the validity of the Secretary's retroactive cost-limit rule, the threshold question is whether the Medicare Act authorizes retroactive rulemaking.

Retroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result. *E. g., Greene* v. *United States*, 376 U. S. 149, 160 (1964); *Claridge Apartments Co.* v. *Commissioner*, 323 U. S. 141, 164 (1944); *Miller* v. *United States*, 294 U. S. 435, 439 (1935); *United States* v. *Magnolia Petroleum Co.*, 276 U. S. 160, 162–163 (1928). By the same principle, a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms. See *Brimstone R. Co.* v. *United States*, 276 U. S. 104, 122 (1928) ("The power to require readjustments for the past is drastic. It . . . ought not to be extended so as to permit unreasonably harsh action without very plain words"). Even where some substantial justification for retroactive rulemaking is presented, courts

should be reluctant to find such authority absent an express statutory grant.

The Secretary contends that the Medicare Act provides the necessary authority to promulgate retroactive cost-limit rules in the unusual circumstances of this case. He rests on alternative grounds: first, the specific grant of authority to promulgate regulations to "provide for the making of suitable retroactive corrective adjustments," 42 U. S. C. § 1395x(v)(1)(A)(ii); and second, the general grant of authority to promulgate cost limit rules, §§ 1395x(v)(1)(A), 1395hh, 1395ii. We consider these alternatives in turn.

### A

The authority to promulgate cost-reimbursement regulations is set forth in § 1395x(v)(1)(A). That subparagraph also provides that:

> "Such regulations shall . . . (ii) provide for the making of suitable retroactive corrective adjustments where, for a provider of services for any fiscal period, the aggregate reimbursement produced by the methods of determining costs proves to be either inadequate or excessive." *Ibid.*

This provision on its face permits some form of retroactive action. We cannot accept the Secretary's argument, however, that it provides authority for the retroactive promulgation of cost-limit rules. To the contrary, we agree with the Court of Appeals that clause (ii) directs the Secretary to establish a procedure for making case-by-case adjustments to reimbursement payments where the regulations prescribing computation methods do not reach the correct result in individual cases. The structure and language of the statute require the conclusion that the retroactivity provision applies only to case-by-case adjudication, not to rulemaking.[1]

---

[1] The Courts of Appeals have not spoken in one voice in construing this provision. Some courts have held that clause (ii) permits the Secretary to promulgate retroactive regulations. *E. g., Tallahassee Memorial Regional Medical Center* v. *Bowen,* 815 F. 2d 1435, 1453–1454 (CA11 1987),

Section 1395x(v)(1)(A), of which clause (ii) is a part, directs the Secretary to promulgate regulations (including cost-limit rules) establishing the methods to be used in determining reasonable costs for "institutions" and "providers" that participate in the Medicare program. Clause (i) of § 1395x(v)(1)(A) requires these cost-method regulations to take into account both direct and indirect costs incurred by "providers." Clause (ii) mandates that the cost-method regulations include a mechanism for making retroactive corrective adjustments. These adjustments are required when, for "*a provider*," the "aggregate reimbursement produced by the methods of determining costs" is too low or too high. By its terms, then, clause (ii) contemplates a mechanism for adjusting the reimbursement received by *a* provider, while the remainder of § 1395x(v)(1)(A) speaks exclusively in the plural. The distinction suggests that clause (ii), rather than permitting modifications to the cost-method rules in their general formulation, is intended to authorize case-by-case inquiry into the accuracy of reimbursement determinations for individual providers. Indeed, it is difficult to see how a corrective adjustment could be made to the aggregate reimbursement paid "a provider" without performing an individual examination of the provider's expenditures in retrospect.

Our conclusion is buttressed by the statute's use of the term "adjustments." Clause (ii) states that the cost-method

---

cert. denied, 485 U. S. 1020 (1988); *Fairfax Nursing Center, Inc.* v. *Califano*, 590 F. 2d 1297, 1300 (CA4 1979); *Springdale Convalescent Center* v. *Mathews*, 545 F. 2d 943, 954–955 (CA5 1977). The Court of Appeals for the Third Circuit has reached the opposite conclusion, construing clause (ii) to provide for nothing more than a year-end balancing of individual providers' cost-reimbursement accounts. *Daughters of Miriam Center for the Aged* v. *Mathews*, 590 F. 2d 1250, 1258, n. 23 (1978). Other courts, without deciding whether clause (ii) permits rulemaking, have held that it requires the Secretary to make case-by-case adjustments to reimbursement determinations. *E. g., St. Paul-Ramsey Medical Center* v. *Bowen*, 816 F. 2d 417, 419–420 (CA8 1987); *Regents of the University of California* v. *Heckler*, 771 F. 2d 1182, 1188–1189 (CA9 1985).

regulations shall "provide for the making of . . . adjustments." In order to derive from this language the authority to promulgate cost-limit rules, the "adjustments" that the cost-method regulations must "provide for the making of" would themselves be additional cost-method regulations. Had Congress intended the Secretary to promulgate regulations providing for the issuance of further amendatory regulations, we think this intent would have been made explicit.

It is also significant that clause (ii) speaks in terms of adjusting the aggregate reimbursement amount computed by one of the methods of determining costs. As the Secretary concedes, the cost-limit rules are one of the methods of determining costs, and the retroactive 1984 rule was therefore an attempt to change one of those methods. Yet nothing in clause (ii) suggests that it permits changes in the *methods* used to compute costs; rather, it expressly contemplates corrective adjustments to the *aggregate amounts* of reimbursement produced pursuant to those methods. We cannot find in the language of clause (ii) an independent grant of authority to promulgate regulations establishing the methods of determining costs.

Our interpretation of clause (ii) is consistent with the Secretary's past implementation of that provision. The regulations promulgated immediately after enactment of the Medicare Act established a mechanism for making retroactive corrective adjustments that remained essentially unchanged throughout the periods relevant to this case. Compare 20 CFR §§ 405.451(b)(1), 405.454(a), (f) (1967), with 42 CFR §§ 405.451(b)(1), 405.454(a), (f) (1983).[2] These regulations

---

[2] It is clear from the language of these provisions that they are intended to implement the Secretary's authority under clause (ii):

"These regulations also provide for the making of suitable retroactive adjustments after the provider has submitted fiscal and statistical reports. The retroactive adjustment will represent the difference between the amount received by the provider during the year for covered services from both [the Medicare program] and the beneficiaries and the amount deter-

provide for adjusting the amount of interim payments received by a provider, to bring the aggregate reimbursement into line with the provider's actual reasonable costs.

These are the only regulations that expressly contemplate the making of retroactive corrective adjustments. The 1984 reissuance of the 1981 wage-index rule did not purport to be such a provision; indeed, it is only in the context of this litigation that the Secretary has expressed any intent to characterize the rule as a retroactive corrective adjustment under clause (ii).

Despite the novelty of this interpretation, the Secretary contends that it is entitled to deference under *Young* v. *Community Nutrition Institute*, 476 U. S. 974, 980–981 (1986), *Chemical Mfrs. Assn.* v. *Natural Resources Defense Council, Inc.*, 470 U. S. 116, 125 (1985), and *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842–844 (1984). We have never applied the principle of those cases to agency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice. To the contrary, we have declined to give deference to an agency counsel's interpretation of a statute where the agency itself has articulated no position on the question, on the ground that "Congress has delegated to the administrative official and not to appellate counsel the responsibility for elaborating and enforcing statutory commands." *Investment Company Institute* v. *Camp*, 401 U. S. 617, 628 (1971); cf. *Burlington Truck Lines, Inc.* v. *United States*, 371 U. S. 156, 168 (1962) ("The courts may not accept appellate counsel's *post hoc* rationalizations for agency [orders]"). Even if we were to sanction departure from this principle in some cases, we would not do so here. Far from being a reasoned and consistent view of the scope of clause (ii), the Secretary's current interpretation of clause (ii) is contrary to the narrow

---

mined in accordance with an accepted method of cost apportionment to be the actual cost of services rendered to beneficiaries during the year." 20 CFR § 405.451(b)(1) (1967); 42 CFR § 405.451(b)(1) (1983).

view of that provision advocated in past cases, where the Secretary has argued that clause (ii) "merely contemplates a year-end balancing of the monthly installments received by a provider with the aggregate due it for the year." *Regents of the University of California* v. *Heckler*, 771 F. 2d 1182, 1189 (CA9 1985); see also *Whitecliff, Inc.* v. *United States*, 210 Ct. Cl. 53, 60, n. 11, 536 F. 2d 347, 352, n. 11 (1976), cert. denied, 430 U. S. 969 (1977). Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate. Accordingly, the retroactive rule cannot be upheld as an exercise of the Secretary's authority to make retroactive corrective adjustments.

## B

The statutory provisions establishing the Secretary's general rulemaking power contain no express authorization of retroactive rulemaking.[3] Any light that might be shed on this matter by suggestions of legislative intent also indicates that no such authority was contemplated. In the first place, where Congress intended to grant the Secretary the authority to act retroactively, it made that intent explicit. As discussed above, § 1395x(v)(1)(A)(ii) directs the Secretary to establish procedures for making retroactive corrective ad-

---

[3] Section 223(b) of the 1972 amendments amended the Medicare Act to state that the Secretary's regulations for computing reasonable costs may "provide for the establishment of limits on the direct or indirect overall incurred costs or incurred costs of specific items or services or groups of items or services to be recognized as reasonable based on estimates of the costs necessary in the efficient delivery of needed health services to individuals covered by the insurance programs established under this subchapter . . . ." 42 U. S. C. § 1395x(v)(1)(A).

Section 1395hh provides that "[t]he Secretary shall prescribe such regulations as may be necessary to carry out the administration of the insurance programs under this subchapter." Finally, § 1395ii incorporates 42 U. S. C. § 405(a), which provides that "[t]he Secretary shall have full power and authority to make rules and regulations . . . , not inconsistent with the provisions of this subchapter, which are necessary or appropriate to carry out such provisions . . . ."

justments; in view of this indication that Congress considered the need for retroactive agency action, the absence of any express authorization for retroactive cost-limit rules weighs heavily against the Secretary's position.

The legislative history of the cost-limit provision directly addresses the issue of retroactivity. In discussing the authority granted by § 223(b) of the 1972 amendments, the House and Senate Committee Reports expressed a desire to forbid retroactive cost-limit rules: "The proposed new authority to set limits on costs . . . would be exercised on a prospective, rather than retrospective, basis so that the provider would know in advance the limits to Government recognition of incurred costs and have the opportunity to act to avoid having costs that are not reimbursable." H. R. Rep. No. 92–231, p. 83 (1971); see S. Rep. No. 92–1230, p. 188 (1972).

The Secretary's past administrative practice is consistent with this interpretation of the statute. The first regulations promulgated under § 223(b) provided that "[t]hese limits will be imposed prospectively . . . ." 20 CFR § 405.460(a) (1975). Although the language was dropped from subsection (a) of the regulation when it was revised in 1979, the revised regulation continued to refer to "the prospective periods to which limits are being applied," and it required that notice of future cost limits be published in the Federal Register "[p]rior to the beginning of a cost period to which limits will be applied . . . ." 42 CFR §§ 405.460(b)(2), (3) (1980). Finally, when the regulations were amended again in 1982, the Secretary reinserted the requirement that the limits be applied with prospective effect, noting that the language had been "inadvertently omitted" in the previous amendment but that the reinsertion would "have no effect on the way we develop or apply the limits." 47 Fed. Reg. 43282, 43286 (1982); see 42 CFR § 405.460(a)(2) (1983).

Other examples of similar statements by the agency abound. Every cost-limit schedule promulgated by the Secretary be-

tween 1974 and 1981, for example, included a statement that § 223 permits the Secretary to establish "prospective" limits on the costs that are reimbursed under Medicare.[4]   The Secretary's administrative rulings have also expressed this understanding of § 223(b).   See *Beth Israel Hospital* v. *Blue Cross Assn./Blue Cross/Blue Shield of Massachusetts,* CCH Medicare and Medicaid Guide ¶ 31,645 (Nov. 7, 1981).

The Secretary nonetheless suggests that, whatever the limits on his power to promulgate retroactive regulations in the normal course of events, judicial invalidation of a prospective rule is a unique occurrence that creates a heightened need, and thus a justification, for retroactive curative rulemaking.   The Secretary warns that congressional intent and important administrative goals may be frustrated unless an invalidated rule can be cured of its defect and made applicable to past time periods.   The argument is further advanced that the countervailing reliance interests are less compelling than in the usual case of retroactive rulemaking, because the original, invalidated rule provided at least some notice to the individuals and entities subject to its provisions.

Whatever weight the Secretary's contentions might have in other contexts, they need not be addressed here.   The case before us is resolved by the particular statutory scheme in question.   Our interpretation of the Medicare Act compels the conclusion that the Secretary has no authority to promulgate retroactive cost-limit rules.

---

[4] See 46 Fed. Reg. 48010 (1981); *id.,* at 33637; 45 Fed. Reg. 41868 (1980); 44 Fed. Reg. 31806 (1979); 43 Fed. Reg. 43558 (1978); 42 Fed. Reg. 53675 (1977); 41 Fed. Reg. 26992 (1976); 40 Fed. Reg. 23622 (1975); 39 Fed. Reg. 20168 (1974); see also 48 Fed. Reg. 39998 (1983) (notice of invalidation of 1981 cost-limit schedule).   Even the notice of proposed rulemaking concerning reissuance of the 1981 schedule contained the statement that § 223 "authorizes the Secretary to set prospective limits on the costs that are reimbursed under Medicare."   49 Fed. Reg. 6175, 6176 (1984).   Interestingly, this statement does not appear in the final notice announcing the reissuance of the 1981 schedule.   *Id.,* at 46495.

The 1984 reinstatement of the 1981 cost-limit rule is invalid. The judgment of the Court of Appeals is

*Affirmed.*

JUSTICE SCALIA, concurring.

I agree with the Court that general principles of administrative law suggest that § 223(b) of the Medicare Act, 42 U. S. C. § 1395x(v)(1)(A), does not permit retroactive application of the Secretary of Health and Human Service's 1984 cost-limit rule. I write separately because I find it incomplete to discuss general principles of administrative law without reference to the basic structural legislation which is the embodiment of those principles, the Administative Procedure Act (APA), 5 U. S. C. §§ 551–552, 553–559, 701–706, 1305, 3105, 3344, 5372, 7521. I agree with the District of Columbia Circuit that the APA independently confirms the judgment we have reached.

The first part of the APA's definition of "rule" states that a rule

> "means the whole or a part of an agency statement of general or particular applicability *and future effect* designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency . . . ." 5 U. S. C. § 551(4) (emphasis added).

The only plausible reading of the italicized phrase is that rules have legal consequences only for the future. It could not possibly mean that merely *some* of their legal consequences must be for the future, though they may also have legal consequences for the past, since that description would not enable rules to be distinguished from "orders," see 5 U. S. C. § 551(6), and would thus destroy the entire dichotomy upon which the most significant portions of the APA are based. (Adjudication—the process for formulating orders, see § 551(7)—has future as well as past legal consequences, since the principles announced in an adjudication cannot be

departed from in future adjudications without reason. See, e. g., *Local 32, American Federation of Government Employees* v. *FLRA*, 248 U. S. App. D. C. 198, 202, 774 F. 2d 498, 502 (1985) (McGowan, J.); *Greater Boston Television Corp.* v. *FCC*, 143 U. S. App. D. C. 383, 393, 444 F. 2d 841, 852 (1970) (Leventhal, J.), cert. denied, 403 U. S. 923 (1971)).

Nor could "future effect" in this definition mean merely *"taking effect* in the future," that is, having a future effective date even though, once effective, altering the law applied in the past. That reading, urged by the Secretary of Health and Human Services (Secretary), produces a definition of "rule" that is meaningless, since obviously *all* agency statements have "future effect" in the sense that they do not take effect until after they are made. (One might argue, I suppose, that "future effect" excludes agency statements that take effect immediately, as opposed to one second after promulgation. Apart from the facial silliness of making the central distinction between rulemaking and adjudication hang upon such a thread, it is incompatible with § 553(d), which makes clear that, if certain requirements are complied with, a rule can be effective immediately.) Thus this reading, like the other one, causes § 551(4) to fail in its central objective, which is to distinguish rules from orders. All orders have "future effect" in the sense that they are not effective until promulgated.

In short, there is really no alternative except the obvious meaning, that a rule is a statement that has legal consequences only for the future. If the first part of the definition left any doubt of this, however, it is surely eliminated by the second part (which the Secretary's brief regrettably submerges in ellipsis). After the portion set forth above, the definition continues that a rule

> "includes the approval or prescription *for the future* of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or account-

ing, or practices bearing on any of the foregoing." 5 U. S. C. § 551(4) (emphasis added).

It seems to me clear that the phrase "for the future"—which even more obviously refers to future operation rather than a future effective date—is not meant to add a requirement to those contained in the earlier part of the definition, but rather to repeat, in a more particularized context, the prior requirement "of future effect." And even if one thought otherwise it would not matter for purposes of the present case, since the HHS "cost-limit" rules governing reimbursement are a "prescription" of "practices bearing on" "allowances" for "services."

The position the Secretary takes in this litigation is out of accord with the Government's own most authoritative interpretation of the APA, the 1947 Attorney General's Manual on the Administrative Procedure Act (AG's Manual), which we have repeatedly given great weight. See, e. g., Steadman v. SEC, 450 U. S. 91, 103, n. 22 (1981); Chrysler Corp. v. Brown, 441 U. S. 281, 302, n. 31 (1979); Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U. S. 519, 546 (1978). That document was prepared by the same Office of the Assistant Solicitor General that had advised Congress in the latter stages of enacting the APA, and was originally issued "as a guide to the agencies in adjusting their procedures to the requirements of the Act." AG's Manual 6. Its analysis is plainly out of accord with the Secretary's position here:

> "Of particular importance is the fact that 'rule' includes agency statements not only of general applicability but also those of particular applicability applying either to a class or to a single person. In either case, they must be of *future effect,* implementing or prescribing future law.
>
> . . . . .
>
> "[T]he entire Act is based upon a dichotomy between rule making and adjudication. . . . Rule making is agency action which regulates the future conduct of either

groups of persons or a single person; it is essentially legislative in nature, not only because it operates in the future but also because it is primarily concerned with policy considerations. . . . Conversely, adjudication is concerned with the determination of past and present rights and liabilities." *Id.*, at 13–14.

These statements cannot conceivably be reconciled with the Secretary's position here that a rule has future effect merely because it is made effective in the future. Moreover, the clarity of these statements cannot be disregarded on the basis of the single sentence, elsewhere in the Manual, that "[n]othing in the Act precludes the issuance of retroactive rules when otherwise legal and accompanied by the finding required by section 4(c)." *Id.*, at 37. What that statement means (apart from the inexplicable reference to § 4(c), 5 U. S. C. § 553(d), which would appear to have no application, no matter which interpretation is adopted), is clarified by the immediately following citation to the portion of the legislative history supporting it, namely, H. R. Rep. No. 1980, 79th Cong., 2d Sess., 49, n. 1 (1946). That Report states that "[t]he phrase 'future effect' does not preclude agencies from considering and, so far as legally authorized, dealing with past transactions in prescribing rules for the future." *Ibid.* The Treasury Department might prescribe, for example, that for purposes of assessing future income tax liability, income from certain trusts that has previously been considered nontaxable will be taxable—whether those trusts were established before or after the effective date of the regulation. That is not retroactivity in the sense at issue here, *i. e.*, in the sense of altering the *past* legal consequences of past actions. Rather, it is what has been characterized as "secondary" retroactivity, see McNulty, Corporations and the Intertemporal Conflict of Laws, 55 Cal. L. Rev. 12, 58–60 (1967). A rule with exclusively future effect (taxation of future trust income) can unquestionably *affect* past transactions (rendering the previously established trusts less desir-

able in the future), but it does not for that reason cease to be a rule under the APA. Thus, with respect to the present matter, there is no question that the Secretary could have applied her new wage-index formulas to respondents in the future, even though respondents may have been operating under long-term labor and supply contracts negotiated in reliance upon the pre-existing rule. But when the Secretary prescribed such a formula for costs reimbursable while the prior rule was in effect, she changed the *law* retroactively, a function not performable by rule under the APA.

A rule that has unreasonable secondary retroactivity—for example, altering future regulation in a manner that makes worthless substantial past investment incurred in reliance upon the prior rule—may for that reason be "arbitrary" or "capricious," see 5 U. S. C. § 706, and thus invalid. In reference to such situations, there are to be found in many cases statements to the effect that "[w]here a rule has retroactive effects, it may nonetheless be sustained in spite of such retroactivity if it is reasonable." *General Telephone Co. of Southwest* v. *United States*, 449 F. 2d 846, 863 (CA5 1971). See also *National Assn. of Independent Television Producers and Distributors* v. *FCC*, 502 F. 2d 249, 255 (CA2 1974) ("Any implication by the FCC that this court may not consider the reasonableness of the retroactive effect of a rule is clearly wrong"). It is erroneous, however, to extend this "reasonableness" inquiry to purported rules that not merely affect past transactions but change what was the law in the past. Quite simply, a rule is an agency statement "of future effect," not "of future effect and/or reasonable past effect."

The profound confusion characterizing the Secretary's approach to this case is exemplified by its reliance upon our opinion in *SEC* v. *Chenery Corp.*, 332 U. S. 194 (1947). Even apart from the fact that that case was not decided under the APA, it has nothing to do with the issue before us here, since it involved adjudication rather than rulemaking. Thus, though it is true that our opinion permitted the Secre-

tary, after his correction of the procedural error that caused an initial reversal, see *SEC* v. *Chenery Corp.*, 318 U. S. 80 (1943), to reach the same substantive result with retroactive effect, the utterly crucial distinction is that *Chenery* involved that form of administrative action where retroactivity is not only permissible but standard. Adjudication *deals* with what the law was; rulemaking deals with what the law will be. That is why we said in *Chenery:*

> "Since the Commission, unlike a court, *does have the ability to make new law prospectively through the exercise of its rule-making powers,* it has less reason to rely upon *ad hoc* adjudication to formulate new standards of conduct . . . . The function of filling in the interstices of the Act should be performed, as much as possible, *through this quasi-legislative promulgation of rules to be applied in the future.*" 332 U. S., at 202 (emphasis added).

And just as *Chenery* suggested that rulemaking was prospective, the opinions in *NLRB* v. *Wyman-Gordon Co.*, 394 U. S. 759 (1969), suggested the obverse: that adjudication could *not* be purely prospective, since otherwise it would constitute rulemaking. Both the plurality opinion, joined by four of the Justices, and the dissenting opinions of Justices Douglas and Harlan expressed the view that a rule of law announced in an adjudication, but with exclusively prospective effect, could not be accepted as binding (without new analysis) in subsequent adjudications, since it would constitute rulemaking and as such could only be achieved by following the prescribed rulemaking procedures. See *id.*, at 764–766 (plurality opinion); *id.*, at 777 (Douglas, J., dissenting); *id.*, at 780–781 (Harlan, J., dissenting). Side by side these two cases, *Chenery* and *Wyman-Gordon*, set forth quite nicely the "dichotomy between rulemaking and adjudication" upon which "the entire [APA] is based." AG's Manual 14.

Although the APA was enacted over 40 years ago, this Court has never directly confronted whether the statute au-

thorizes retroactive rules. This in itself casts doubt on the Secretary's position. If so obviously useful an instrument was available to the agencies, one would expect that we would previously have had occasion to review its exercise. The only Supreme Court case the Government cites, however, is the *pre*-APA case of *Addison* v. *Holly Hill Fruit Products, Inc.*, 322 U. S. 607 (1944). That case does not stand for a general authority to issue retroactive rules before the APA was enacted, much less for authority to do so in the face of § 551(4). *Addison* involved the promulgation of a definition of "area of production" by the Administrator of the Wage and Hour Division, for purposes of an exemption to the Fair Labor Standards Act of 1938, 52 Stat. 1060, as amended, 29 U. S. C. § 201 *et seq.* We found his definition unlawful—but instead of directing the entry of judgment for the employees who were claiming higher wages, we remanded the case to the District Court "with instructions to hold it until the Administrator, by making a valid determination of the area with all deliberate speed, acts within the authority given him by Congress." 322 U. S., at 619. It is not entirely clear that we required this determination to be made by regulation rather than by a declaratory order applicable to the case at hand. Where an interpretive rule is held invalid, and there is no pre-existing rule which it superseded, it is obviously available to the agency to "make" law retroactively through adjudication, just as courts routinely do (and just as we indicated the Secretary of Agriculture could have done in *United States* v. *Morgan*, 307 U. S. 183, 193 (1939)). Perhaps that is all *Addison* stands for. Arguably, however, the Administrator was *obliged* to act by regulation rather than by adjudication, since the statutory exemption in question referred to "area of production (as defined by the Administrator)." See 322 U. S., at 608. If the parenthetical had the effect of requiring specification by rule (rather than through adjudication), then the Court *would* have been authorizing a retroactive regulation. But it would have been doing so in a situa-

tion where one of two legal commands had to be superseded. In these circumstances, either the Administrator had to contravene normal law by promulgating a retroactive regulation, or else the Administrator would, by his inaction, have totally eliminated the congressionally prescribed "area of production" exemption. Something had to yield. If this case involves retroactive rulemaking at all, it does not stand for the Government's asserted principle of the general permissibility of retroactive rules so long as they are reasonable, but rather for the much narrower (and unexceptional) proposition that a particular statute may in some circumstances implicitly authorize retroactive rulemaking.

This case cannot be disposed of, as the Secretary suggests, by simply noting that retroactive rulemaking is similar to retroactive legislation, and that the latter has long been upheld against constitutional attack where reasonable. See, *e. g.*, *Pension Benefit Guaranty Corp.* v. *R. A. Gray & Co.*, 467 U. S. 717 (1984); *Baltimore & Susquehanna R. Co.* v. *Nesbit*, 10 How. 395 (1851). See generally Hochman, The Supreme Court and the Constitutionality of Retroactive Legislation, 73 Harv. L. Rev. 692 (1960). The issue here is not constitutionality, but rather whether there is any good reason to doubt that the APA means what it says. For purposes of resolving that question, it does not at all follow that, since Congress itself possesses the power retroactively to change its laws, it must have meant agencies to possess the power retroactively to change their regulations. Retroactive legislation has always been looked upon with disfavor, see Smead, The Rule Against Retroactive Legislation: A Basic Principle of Jurisprudence, 20 Minn. L. Rev. 775 (1936); 2 J. Story, Commentaries on the Constitution of the United States § 1398, p. 272 (5th ed. 1891), and even its constitutionality has been conditioned upon a rationality requirement beyond that applied to other legislation, see *Pension Benefit Guaranty Corp.*, *supra*, at 730; *Usery* v. *Turner Elkhorn Mining Co.*, 428 U. S. 1, 16–17 (1976). It is en-

tirely unsurprising, therefore, that even though Congress wields such a power itself, it has been unwilling to confer it upon the agencies. Given the traditional attitude towards retroactive legislation, the regime established by the APA is an entirely reasonable one: Where quasi-legislative action is required, an agency cannot act with retroactive effect without some special congressional authorization. That is what the APA says, and there is no reason to think Congress did not mean it.

The dire consequences that the Secretary predicts will ensue from reading the APA as it is written (and as the Justice Department originally interpreted it) are not credible. From the more than 40 years of jurisprudence since the APA has been in effect, the Secretary cites only one holding and one alternative holding (set forth in a footnote) sustaining retroactive regulations. See *Citizens to Save Spencer County* v. *EPA*, 195 U. S. App. D. C. 30, 600 F. 2d 844 (1979); *National Helium Corp.* v. *FEA*, 569 F. 2d 1137, 1145, n. 18 (Temp. Emerg. Ct. App. 1977). They are evidently not a device indispensable to efficient government. It is important to note that the retroactivity limitation applies *only* to rulemaking. Thus, where legal consequences hinge upon the interpretation of statutory requirements, and where no preexisting interpretive rule construing those requirements is in effect, nothing prevents the agency from acting retroactively through adjudication. See *NLRB* v. *Bell Aerospace Co.*, 416 U. S. 267, 293–294 (1974); *SEC* v. *Chenery Corp.*, 332 U. S., at 202–203. Moreover, if and when an agency believes that the extraordinary step of retroactive rulemaking is crucial, all it need do is persuade Congress of that fact to obtain the necessary ad hoc authorization. It may even be that implicit authorization of particular retroactive rulemaking can be found in existing legislation. If, for example, a statute prescribes a deadline by which particular rules must be in effect, and if the agency misses that deadline, the statute may be interpreted to authorize a reasonable retroactive rule despite

the limitation of the APA. (Such a situation would bear some similarity to that in *Addison*.)

I need not discuss what other exceptions, with basis in the law, may permit an agency to issue a retroactive rule. The only exception suggested by the Secretary to cover the present case has no basis in the law. The Secretary contends that the evils generally associated with retroactivity do not apply to reasonable "curative" rulemaking—that is, the correction of a mistake in an earlier rulemaking proceeding. Because the invalidated 1981 wage-index rule furnished respondents with "ample notice" of the standard that would be applied, the Secretary asserts that it is not unfair to apply the identical 1984 rule retroactively. I shall assume that the invalidated rule provided ample notice, though that is not at all clear. It makes no difference. The issue is not whether retroactive rulemaking is fair; it undoubtedly may be, just as may prospective adjudication. The issue is whether it is a permissible form of agency action under the particular structure established by the APA. The Secretary provides nothing that can bring it within that structure. I might add that even if I felt free to construct my own model of desirable administrative procedure, I would assuredly not sanction "curative" retroactivity. I fully agree with the District of Columbia Circuit that acceptance of the Secretary's position would "make a mockery . . . of the APA," since "agencies would be free to violate the rulemaking requirements of the APA with impunity if, upon invalidation of a rule, they were free to 're-issue' that rule on a retroactive basis." 261 U. S. App. D. C. 262, 270, 821 F. 2d 750, 758 (1987).

For these reasons in addition to those stated by the Court, I agree that the judgment of the District of Columbia Circuit must be affirmed.