# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 14, 2022        Decided April 19, 2022

No. 21-5088

MURRAY BRAUN,
APPELLANT

v.

UNITED STATES OF AMERICA, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:20-cv-02613)

———

*Robert J. Tolchin* argued the cause and filed the briefs for appellant.

*Jerry S. Goldman* argued the cause for *amici curiae* Christine I. O'Neill, et al. in support of appellant. With him on the brief were *Jodi Westbrook Flowers*, *Hon. Ethan Greenberg (Ret.)*, and *Bruce Strong*.

*Joshua M. Koppel*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Brian M. Boynton*, Acting Assistant Attorney General at the time of briefing, and *Sharon Swingle*, Attorney.

Before: HENDERSON, TATEL, and MILLETT, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: This case traces its roots to an especially appalling atrocity: the killing of a three-month-old girl by a Hamas terrorist. Unable to undo the human toll of such attacks, Congress has sought to provide victims with monetary compensation through a fund established by the Justice for United States Victims of State Sponsored Terrorism Act. Pursuant to that statute, known as the "Terrorism Act," the child's grandfather, Murray Braun, has received roughly $250,000 of a multimillion-dollar judgment against the Islamic Republic of Iran, a state sponsor of terrorism. Contending that the law requires more prompt and regular payment to claimants like himself, Braun sued the federal officials administering the fund. The district court concluded that the government's distribution of funds was consistent with the statute and dismissed the complaint. For the reasons set forth below, we affirm.

## I.

The Foreign Sovereign Immunities Act authorizes courts to order foreign state sponsors of terrorism to pay damages to their victims. *See* 28 U.S.C. §§ 1605A, 1606. Because such states are unlikely to pay, Congress passed the Terrorism Act in 2015, which established a fund to compensate claimants. Pub. L. No. 114-113, 129 Stat. 2242, 3007 (2015) (codified as amended at 34 U.S.C. § 20144). The statute drew on two different sources of funding: (1) an initial appropriation of $1.025 billion from "money in the Treasury not otherwise appropriated" ("General Fund"); and (2) proceeds from penalties paid by companies and individuals that violate sanctions imposed on state sponsors of terrorism, specifically,

one hundred percent of criminal penalties and fifty percent of civil penalties. *Id.* § 404(e)(2), (e)(5).

In addition to establishing the fund, the Terrorism Act sets forth rules for the fund's administration. If the fund's balance exceeds $100 million, the Attorney General must appoint a special master, 34 U.S.C. § 20144(b)(1)(A), who in turn is responsible for promulgating procedures to determine claim eligibility, *id.* § 20144(b)(2)(A), and for "authoriz[ing] . . . payments" to claimants, which the statute requires be made annually "if funds are available," *id.* § 20144(d)(4)(A). Because the aggregate eligible claims exceed the fund's balance, for every round of payment, the special master calculates the pro rata amount that each claimant should receive and authorizes payment accordingly. *Id.* § 20144(d)(3). Claimants continue to receive payment in each round of distribution until they have received the total amounts of their claims or until the fund's end date, currently set for January 2, 2039. *Id.* § 20144(e)(6).

In 2019, after the fund had made two rounds of payments, Congress amended the Terrorism Act through the United States Victims of State Sponsored Terrorism Fund Clarification Act. Pub. L. No. 116-69, 133 Stat. 1134, 1140 (2019) (codified at 34 U.S.C. § 20144). Known as the "Clarification Act," the amendments significantly expanded the number of eligible claimants by opening the fund to those who had received an award or award determination from the 9/11 Victim Compensation Fund. *Id.* § 1701(b). Simultaneously, the Clarification Act amendments increased the percentage of civil penalties that would go into the Terrorism Act fund from fifty to seventy-five percent, *id.*, set an extended timeline for issuing third-round payments, *id.*, and provided that these amendments would take effect "on the date of enactment of this Act," *id.* § 1701(d).

On October 22, 2014, a Hamas operative intentionally rammed his car into a crowd of pedestrians at a light rail station in Jerusalem. *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 72 (D.D.C. 2017). He killed three-month-old Chaya Zissel Braun and badly injured her father, both United States citizens.

Following the attack, Chaya Zissel's estate, parents, and grandparents filed suit against several defendants, including the Islamic Republic of Iran as a state sponsor of Hamas. When the defendants failed to appear, the district court entered default judgments for the plaintiffs: $1 million to Chaya Zissel's estate; $8.75 million to each parent; $2.5 million to each grandparent; and $150 million in punitive damages.

Murray Braun, Chaya Zissel's grandfather, then applied to the fund for compensation. He was found eligible for $2.5 million and received almost $105,000 from the second-round distribution in January 2019. In August 2020, he was notified that he would receive an additional $146,000 from the third-round distribution. That same summer, the fund announced that there would be no fourth-round distribution in 2021 because insufficient funds were available.

In September 2020, after receiving notice of his third-round entitlement but before receiving payment, Braun filed this action against the fund's administrators. He sought declaratory and injunctive relief on four claims: (1) that the Clarification Act's increased percentage provision applies to civil penalties collected between the passage of the Terrorism Act and the Clarification Act; (2) that the fund is obligated to make a supplemental payment reflecting the fund's increased share of those past penalties; (3) that the Attorney General must appoint a special master who must make a distribution when the fund's balance exceeds $100 million; and (4) that the fund

was required to make third-round payments by May 19, 2020 and is otherwise required to make payments by January 1 of each year for which a distribution will be made. The next month, Braun received his third-round payment in the amount of $145,963.33.

The government moved to dismiss, the district court granted the motion, *Braun v. United States*, 531 F. Supp. 3d 130 (D.D.C. 2021), and Braun now appeals. Our review is de novo. *Webb v. United States Veterans Initiative*, 993 F.3d 970, 971–72 (D.C. Cir. 2021) (noting that dismissals under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) are reviewed de novo).

## II.

We begin with Braun's first claim, that the amendment increasing the fund's share of civil penalties from fifty to seventy-five percent applies not only to penalties collected after the Clarification Act amendments, but also retroactively to penalties assessed between the passage of the Terrorism Act (December 18, 2015) and the Clarification Act (November 21, 2019). In support, Braun relies on language in the Terrorism Act as originally enacted, which entitled the fund to "[o]ne-half of all funds, and one-half of the net proceeds from the sale of property, forfeited or paid to the United States *after the date of enactment of this Act*"—"after December 18, 2015." Pub. L. No. 114-113 § 404(e)(2)(A)(ii) (emphasis added); 34 U.S.C. § 20144(e)(2)(A)(ii) (2018). The Clarification Act changed "one-half" to "seventy-five" percent but left the 2015 date unaltered. Thus, Braun contends, the increase applies to all penalties "forfeited or paid to the United States after December 18, 2015." 34 U.S.C. § 20144(e)(2)(A)(ii). Practically speaking, Braun believes this means the amendment "required Treasury to do a simple arithmetic calculation: calculate half the amount already

deposited in the [f]und from the civil sanctions since December 18, 2015, add that amount to the [f]und, and let it be distributed pursuant to the [Terrorism] Act." Appellant's Br. 31. According to the government, because those penalty proceeds have already been spent, this amount would have to come from the Treasury's General Fund.

Braun's interpretation of the statute is untenable for several reasons. To begin with, as the district court pointed out, the Clarification Act's applicability provision expressly states that "[t]his section and the amendments made by this section shall take effect on the date of enactment of this Act," November 21, 2019. Pub. L. No. 116-69 § 1701(d); *see also Braun*, 531 F. Supp. 3d at 137. Because the increase from fifty to seventy-five percent is one such amendment, it became effective on November 21, 2019 and no earlier.

Braun insists that the statute's "plain language" requires that we give effect to provisions retaining the 2015 date. Appellant's Reply Br. 4. But this would produce an absurd result. Read literally, the statute as amended requires the government to deposit the requisite percentages from criminal and civil penalties into the fund "[b]eginning on December 18, 2015," 34 U.S.C. § 20144(e)(2), which of course is impossible, given that the Clarification Act—which authorized the increase to seventy-five percent—had not yet been passed. This is one of those "absurdities of literalism that show that Congress could not have been writing in a literalistic frame of mind." *Corley v. United States*, 556 U.S. 303, 317 (2009).

Two other interpretive rules further undermine Braun's position. First, because "[r]etroactivity is not favored in the law," "congressional enactments . . . will not be construed to have retroactive effect *unless their language requires this*

*result*." *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 208 (1988) (emphasis added). This canon reflects Congress's proven ability to make clear when it wants a statute to have retroactive effect. For example, the Federal Home Loan Bank Act makes certain money deposited in the Treasury "available . . . retroactively as well as prospectively." 12 U.S.C. § 1439a. Similarly, the now-repealed Black Lung Benefits Reform Act required the Secretary of Labor to reevaluate previously denied claims and award qualifying claimants benefits "on a retroactive basis." 30 U.S.C. § 945(c) (repealed 2002). The Terrorism Act as amended contains no such express language requiring retroactive application.

Braun argues that "retroactive application of a new law really has nothing to do with this case," because he seeks only "to apply the current law, exactly as it is written, to the present." Appellant's Br. 27. Yet even so viewed, Braun's reading runs up against a second obstacle: as Congress itself has made clear, "[a] law may be construed to make an appropriation out of the Treasury . . . only if the law specifically states that an appropriation is made." 31 U.S.C. § 1301(d). As Braun concedes, to give effect to his interpretation, we would have to order the Treasury to make an appropriation from the General Fund. Yet the statute authorizes no such general appropriation. To the contrary, the Terrorism Act establishes a two-part funding scheme, only the first of which is funded by appropriations. Specifically, Congress (1) "appropriated" $1.025 billion "for fiscal year 2017" and (2) directed that the fund receive "[f]orfeited funds and property" thereafter. *See* 34 U.S.C. § 20144(e)(5) (initial appropriation); *id.* § 20144(e)(2) (penalty funding).

Because the statute nowhere authorizes the retroactive increase of penalties collected prior to the Clarification Act amendments, we shall affirm the district court's dismissal of

this claim. *Braun*, 531 F. Supp. 3d at 137. And because, as Braun concedes, we need reach his second claim only "[i]n the event [that he] prevails on Count 1," we shall also affirm the district court's dismissal of his second claim. Appellant's Br. 35.

Braun's third claim, as argued to the district court, sought an injunction "requiring the Attorney General 'to appoint a [s]pecial [m]aster going forward if there is more than $100 million in the [f]und' and ordering that the [s]pecial [m]aster 'make a distribution in 2021.'" *Braun*, 531 F. Supp. 3d at 138 (quoting Compl. ¶¶ 4, 59). The district court dismissed the first part of this claim because on January 4, 2021, the fund appointed a special master, rendering the request for an appointment moot. *Id.*; *see also True the Vote, Inc. v. IRS*, 831 F.3d 551, 558 (D.C. Cir. 2016) ("Even where a case once posed a live controversy when filed, the mootness doctrine requires the Court to refrain from deciding it if events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." (cleaned up)). Braun did not challenge this aspect of the district court's decision in his appellate briefs. But two days before oral argument, in a supplemental letter to the court, he argued that the current special master's term had expired "about five weeks ago, on January 4, 2022," and that his request for an injunction to appoint a special master "is [therefore] no longer moot." 28(j) Letter at 1–2, *Braun v. United States*, No. 21-5088 (Feb. 12, 2022). We decline to resolve without briefing this late-raised issue, as well as his even-later-raised argument that appointment of a special master must be by the Attorney General. 28(j) Letter at 1, *Braun v. United States*, No. 21-5088 (Feb. 13, 2022). If Braun wishes to pursue these arguments, he may file an amended complaint in the district court.

As for the remainder of this claim, Braun argues that once the fund's balance exceeds $100 million, "the special master is required to distribute all the money in the [f]und to claimants." Appellant's Br. 36–37. But as the district court explained, the statute "does not set a threshold for mandating distributions from the [f]und." *Braun*, 531 F. Supp. 3d at 138. Instead, the special master must authorize payments "if funds are available." 34 U.S.C. § 20144(d)(4)(A). Critically for our purposes, however, all funds are not necessarily "available" for distribution. The statute instructs that the fund's personnel costs and other administrative costs "shall be paid from the [f]und," *id.* § 20144(b)(1)(B), and further requires the special master to "allocate but withhold payment" to so-called conditional claimants, who are still awaiting adverse final judgments in court but otherwise qualify for the fund, *id.* § 20144(e)(2)(B)(iv). As a result, the fund "may contain more than $100 million but have no money available for a distribution because of statutorily required reserves for conditional claimants and administrative expenses." Appellees' Br. 20. To illustrate this point, the government reports that in the second-round distribution, payments set aside "for conditional claimants totaled nearly $81 million," and "those reserved funds [were] even greater" in the third-round distribution. *Id.* at 42. In reply, Braun claims that "2021 is now over and the time has expired for any claimants to qualify for" the fourth-round distribution. Appellant's Reply Br. 11. But that misses the point: as the government has explained, it is possible for the fund to exceed $100 million and still lack "available" funds, making it inappropriate to treat that amount as an obligatory threshold for distribution. To be sure, there may be limits to the special master's discretion when determining fund availability, but Braun makes no such argument. Accordingly, we shall affirm the district court's dismissal of Braun's third claim.

Braun's fourth claim has two parts. First, he contends that the Clarification Act's modified timeline for third-round payments required the fund to pay claimants by May 19, 2020, "180 days . . . after the date of enactment" of the Clarification Act. Pub. L. No. 116–69 § 1701(b). Braun acknowledges that he has now received his third-round payment yet insists that this does not render his claim moot because the fund "has still not paid out the distributions to some Third-Round-eligible claimants." Appellant's Br. 23. But because Braun obviously lacks standing to pursue this action on other claimants' behalf, we shall dismiss this part of his claim as moot.

The second part of Braun's claim concerns the statutory timeline applicable to payments other than the third-round distribution. The statute provides that "on January 1 of the second calendar year that begins after the date of the initial payments . . . the [s]pecial [m]aster shall authorize additional payments on a pro rata basis . . . and shall authorize additional payments for eligible claims annually thereafter." 34 U.S.C. § 20144(d)(4)(A). Although the parties agree that this provision establishes a mandatory deadline for authorizing payment, they disagree about what that means.

To understand the parties' dispute, we think it helpful to describe the notices the fund sent to Braun regarding his claim. On May 18, 2017, the fund sent Braun a notice that it had "determined [his] claim to be eligible" for $2.5 million. First Notice, Appendix (Appx.) 72. The letter continued:

> Although the . . . [f]und has determined that your claim is eligible, please note that there is no guarantee that you will receive the total eligible claim amount. Rather, the amount of your first payment will be calculated after the . . . [f]und determines the amount of funds available from which to pay claims and after

any statutory limitations are applied to the total eligible claim amount shown above. You will be notified about the exact amount of your first payment after the [s]pecial [m]aster authorizes the next distribution in January 2019.

*Id.* A year and a half later, on December 13, 2018, the fund notified Braun that his "allocated payment amount for this distribution [was] $104,887.61." Second Notice, Appx. 74. The notice instructed Braun to complete a direct deposit form if he had not already done so but otherwise articulated no further steps necessary to receive payment. *Id.* Braun received payment the following month. Then, in August 2020, Braun was sent a letter stating that his third-round distribution would be $145,963.33. Lee Decl., Appx. 107 ¶ 4.

Braun contends that none of these notices satisfy the Terrorism Act's requirement to "authorize . . . payment[]." 34 U.S.C. § 20144(d)(4)(A). To authorize payment, he argues, means to "actually *pay* money to any claimant by" January 1. Appellant's Br. 38. But as the government argues, the words "authorize" and "expend" have different meanings, and if Congress had meant to require the government to "pay" or "expend" funds by January 1, it would have said so directly. The statute's sunset clause demonstrates that Congress not only knew how to use the word "expend," but also imbued it with meaning distinct from payment authorization. That clause provides that "on the day after all amounts *authorized to be paid* from the [f]und . . . that were obligated before January 2, 2039 are *expended*, any unobligated balances in the [f]und shall be transferred" to other funds. 34 U.S.C. § 20144(e)(6)(B) (emphasis added). "This meaningful variation," the district court explained, "clarifies that 'authorize' does not simply mean 'expend' or 'pay.'" *Braun*, 531 F. Supp. 3d at 139. Instead, "authorization is a precursor to expenditure." *Id.*

For its part, the government equates "authoriz[ing] . . . payment[]" with determining claim eligibility. 34 U.S.C. § 20144(d)(4)(A). Under this interpretation, authorization occurred when the government sent Braun the May 18, 2017 notice recognizing his claim to $2.5 million. But this reading also has flaws. For one thing, the provision containing the January 1 deadline appears in the subsection dedicated to payments, not claim eligibility. *Compare* 34 U.S.C. § 20144(d) *with id.* § 20144(c). Moreover, as Braun points out, "eligibility letters are issued only one time after a claimant submits a claim, and are not re-issued in subsequent years to claimants already determined to be eligible," putting the government's reading in tension with the provision's instruction to "authorize additional payments for eligible claims *annually* thereafter if funds are available." Appellant's Br. 40 (first quote); 34 U.S.C. § 20144(d)(4)(A) (second quote) (emphasis added). And finally, the May 18, 2017 eligibility notice by its own terms distinguishes itself from payment authorization, notifying Braun that he will learn the exact amount of his first payment "after the [s]pecial [m]aster *authorizes* the next distribution." First Notice, Appx. 72 (emphasis added).

There is a third possible interpretation: that payment authorization occurs when the fund issues a notice allocating a specific payment amount for distribution. Viewed this way, it was the December 2018 letter advising Braun that his "allocated payment amount for this distribution [was] $104,887.61" that authorized payment. Second Notice, Appx. 74. Interpreting payment authorization this way would serve two purposes. First, it would require more than a threshold determination that a claim is eligible and comport with the statute's requirement that the fund "authorize additional payments on a pro rata basis" and do so "annually." 34 U.S.C. § 20144(d)(4)(A). And second, it would stop short

of "payment," thus giving meaning to Congress's differentiated use of "authorize payment" and "expend."

At oral argument, however, Braun's counsel disavowed this interpretation, contending that the notice merely "tell[s] somebody how much they might one day expect to get if payment is ever made," which would, in his view, allow an unacceptable delay in actual payment. This leaves us with Braun's untenable reading of the statute, which the district court correctly rejected. We shall therefore affirm the district court's dismissal of Braun's fourth claim.

## III.

For the foregoing reasons, we affirm.

*So ordered.*