Levine, J.
(dissenting). The State Commissioner of Health (the Commissioner) has made a reasonable and unrefuted determination that a straightforward application of the so-called "RUG-II” (Resource Utilization Group) Medicaid reimbursement rate methodology to the 1989-1991 rate years would result in the State’s nursing homes receiving reimbursement at rates which contain an inflationary factor not ascribable to the cost of patient care. Medicaid reimbursement rates containing such an inflationary factor unrelated to the cost of care would clearly transgress the fundamental statutory objective of health care reimbursement regulation that limits rates to the reasonable costs of efficiently operated facilities. Based upon its reading of New York State Assn. of Counties v Axelrod (78 NY2d 158) (hereinafter NYSAC) and Public Health Law § 2807 (7) (a), a majority of this Court holds that the Commissioner is prevented from applying a rational, facility-specific methodology to eliminate that inflation. We disagree.
To understand why neither NYSAC (supra) nor Public Health Law § 2807 (7) (a) requires that result, some recapitulation of the evolution of the State’s Medicaid rate reimbursement system through RUG-II may be helpful. Since the enactment of the Cost Control Act of 1969 (L 1969, ch 957), New York has set nursing home Medicaid reimbursement rates prospectively in advance of the applicable rate year, based upon each facility’s allowable costs for a given prior year (the base year), trended forward to account for inflation (see, NYSAC, 78 NY2d, at 162). Except for distinctions between health-related facility (HRF) component units and skilled nursing facility (SNF) units in the same nursing home (see, Matter of Cortlandt Nursing Care Ctr. v Whalen, 46 NY2d 979, 980), the prospective rates did not account for gradations in the level of care within each facility caused by differences in the relative severity of its patients’ health problems. The RUG-II system, *267 adopted in January 1986, was designed to reflect fairly such bona fide differences in levels of care due to variations in patients’ conditions, and also to provide an incentive for nursing homes to accept patients having greater care needs (see, NYSAC, 78 NY2d, at 162).
RUG-II’s methodology for accomplishing the foregoing salutary goals is, first, to divide the entire spectrum of ill or disabled patients in the State’s nursing homes into 16 Resource Utilization Groups, classified according to gradations of consumption of nursing home resources. Each patient’s placement in one of the 16 RUG-II categories is determined by a detailed, comprehensive assessment of her or his condition and care needs on a Patient Review Instrument (PRI) form, which must be filled out by a registered nurse on the facility’s staff and certified by the nursing home operator (see, id.). Each of the 16 RUG-II categories is assigned a numeric weight to reflect the relative health care resources utilized for that class of patients. That numeric weight constitutes the "case mix index” (CMI) for that group of patients. A nursing home facility’s CMI is the weighted average of RUG-II categories for all of its residents at a particular time.
At the initial implementation of RUG-II in January 1986, the 1985 facility CMIs were used, which in turn were based upon 1985 PRIs prepared by the facility’s patient-assessment staff. Those 1985 CMIs performed two functions. First, a facility’s CMI/cost ratio was utilized, in comparison to Statewide mean CMI/cost ratios, to adjust up or down the facility’s allowable costs for its 1983 base year. Generally, this meant that an efficiently operated facility with a higher CMI received a more favorable reimbursement rate. Second, and more importantly for this appeal, each facility’s 1985 CMI is used as a benchmark for comparison with that facility’s CMI in subsequent rate years. The facility’s base year allowable direct operating costs component of its reimbursement rate is adjusted upward by the percentage increase in the facility’s CMI, thereby providing an incentive for the facility to admit patients requiring more intensive care.
Even before the January 1, 1986 effective date of the RUG-II Medicaid rate reimbursement system, the Commissioner had anticipated that increases in reported facility CMIs subsequent to the initial 1985 CMIs would occur at least partly because of "paper optimization”. The phenomenon of paper optimization comes from the fact that a facility’s CMI is *268 derived from the levels of care of its residents as assessed by its staff on each resident’s PRI. As already noted, the PRI assessment and reporting process is detailed and complex. Thus, it was natural to expect that a facility’s CMI would be understated during the initial, introductory stage of the RUG-II system, and would increase as the facility’s staff became more sophisticated in comprehensively and thoroughly completing each patient’s PRI, despite the lack of any actual change in that patient’s level of care (see, NYSAC, 78 NY2d, at 163). The Commissioner’s supposition was supported by (1) scholarly research on similar, diagnostically based reimbursement systems in the health care field, in which paper optimization was identified (see, id., at 172 [Hancock, Jr., J., dissenting]); and (2) by a sample of 85 facilities that submitted PRI information on the same patients in March 1985 and June/ July 1985, showing an increase in CMIs unexplainable by patient deterioration during this brief period.
When the anticipated increases in reported 1986 facility CMIs in fact took place (which, under RUG-II would require a corresponding increase in each facility’s allowable direct operating costs for its base year), the Commissioner responded by promulgating the initial recalibration regulation, imposing an across-the-board 3.035% reduction in the direct operating costs component of nursing home Medicaid reimbursement rates. That recalibration regulation was annulled in NYSAC (supra). The majority in NYSAC characterized its decision as a “narrow holding of irrationality” (78 NY2d, at 167), basing that conclusion principally on two factors: (1) the absence of documentation that “all facilities had experienced — even on average or mean — a 3.035% increase in CMI attributable solely to improved PRI reporting compliance experience”, and not at all to other possible causes (id., at 168); and (2) the application of a uniform percentage reimbursement rate reduction to all facilities, irrespective of whether some facilities experienced little or no increases in CMIs, or increases legitimately attributable to actually providing increased care of patients (id.).
Clearly, then, in deciding NYSAC this Court did not reject as irrational or lacking an evidentiary basis the Commissioner’s determination that the increases in facility CMIs from 1985 to 1986 under the RUG-II methodology were at least partly caused by paper optimization. Moreover, the documentation of the existence of paper optimization was far more thoroughly established in the instant case than it was or could *269 have been in the NYSAC record. The Department of Health conducted a number of studies of the same patients in facilities between 1985 and 1988. These studies identified increases in CMIs which could not be attributed to the patients’ deterioration due to the natural aging process. Thus, the studies confirm the original data and research literature upon which the Commissioner initially concluded that paper optimization was artificially increasing CMIs over the 1985 base year figures.
Because of the overriding statutory duty of the Commissioner to determine and certify only those Medicaid reimbursement rates that are "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities” (Public Health Law § 2807 [3]), the Commissioner would have been highly derelict in approving nursing home facilities’ reimbursement rates the direct costs components of which were artificially inflated by the paper optimization he found to have existed. Nonetheless, the Commissioner will be mandated to do so for the 1989-1991 rate years of the State’s nursing homes under today’s majority decision.
In our view, this unfortunate result reached by the majority is not compelled by Public Health Law § 2807 (7) (a) but proceeds from the majority’s misinterpretation of the NYSAC judgment and the majority’s failure to distinguish between a preexisting, approved facility reimbursement rate and a preexisting rate-making methodology. As will be explained below, that distinction undercuts the majority’s rationale for deciding this appeal. The NYSAC judgment only became final and binding in June 1991 when this Court reinstated it in reversing the Appellate Division’s order granting judgment to the NYSAC defendants. The NYSAC judgment invalidated the 1987 across-the-board recalibration regulation and directed the Commissioner "to recompute the Medicaid reimbursement rates in effect from January 1, 1987 onward for each county nursing home without reference to, or utilization of, the recalibration regulation”, without dictating the method of recomputation.[1]
*270 As petitioners Jewish Home and Infirmary of Rochester, New York, Inc. and New York Association of Homes and Services for the Aging, Inc. (hereinafter petitioners)[2] themselves point out, after the ruling in NYSAC (78 NY2d 158, supra) under principles of stare decisis applicable without recourse to joinder by class action against a State agency (see, Brady v State of New York, 172 AD2d 17, 25, affd 80 NY2d 596, cert denied — US —, 113 S Ct 2998), the Commissioner was bound to accord the same relief to petitioners and other facilities similarly situated to the NYSAC plaintiffs. However, when the Commissioner and other NYSAC defendants appealed the initial NYSAC judgment, the automatic statutory stay of the judgment went into effect (CPLR 5519 [a] [1]). Thus, uncontestably, the only Medicaid reimbursement rates that had been fixed with respect to petitioners’ nursing home facilities for the 1989-1991 rate years were those in which the former recalibration regulation, invalidated in NYSAC, had been applied. Clearly then, this is not a case where a favorable reimbursement rate was already in effect for the pertinent rate years and was then invalidly superseded by a less favorable rate adjustment retroactively applied to enforce recoupment of the resultant overpayments, and in which the appropriate judicial remedy is reinstatement of the original reimbursement rate (see, Matter of Wellsville Manor Nursing Home v Axelrod, 142 AD2d 225, lv denied 74 NY2d 602; Hurlbut v Whalen, 58 AD2d 311, lv denied 43 NY2d 643, cited with approval in Jordan Health Corp. v Axelrod, 67 NY2d 935, 936-937).
It follows from the foregoing that in 1991, when the Commissioner, in conformity with the decree of NYSAC (supra), vacated petitioners’ reimbursement rates for the 1989-1991 rate years (initially calculated and set prospectively on the basis of the nullified recalibration regulation), there were no preexisting, prospectively set reimbursement rates which could have been reinstated. At most, there was a preexisting methodology (the original RUG-II system methodology) which could have been employed for recomputing those rates. Thus, because of the absence here of any preexisting 1989-1991 rates to be restored once the invalid rates were nullified at petition *271 ers’ behest, the inevitable consequence of the Commissioner’s compliance with the NYSAC judgment was a retrospective determination of petitioners’ reimbursement rates for the 1989-1991 rate years, in unavoidable noncompliance with the requirement of Public Health Law § 2807 (7) (a) that notice of an approved reimbursement rate be given to the facility at least 60 days "prior to the beginning of an established rate period for which the rate is to become effective”.
The foregoing conclusion is not merely a matter of statutory construction, as the majority suggests. Simply put, without access to the time-machine of fantasy and science fiction, the Commissioner in 1991 could not comply with both the dictate of NYSAC requiring recomputation of the 1989-1991 Medicaid reimbursement rates, and the dictate of Public Health Law § 2807 (7) (a) that the recomputed rates must be announced 60 days before the beginning of the 1989-1991 rate years. Converting this physical and logical impossibility into an appropriate statement of legal principle, one can fairly conclude that petitioners, in seeking the benefit of the NYSAC judgment by way of a retroactive redetermination of their 1989-1991 rates, either waived their rights to advance notice under Public Health Law § 2807 (7) (a), or were not aggrieved by the Commissioner’s noncompliance with that section.
The majority, in concluding (majority opn, at 260-261) that retroactive rate setting can be avoided here merely by requiring the Commissioner to apply for rate years 1989-1991 the original RUG-II methodology left intact after NYSAC voided the recalibration regulation, is relying on a non sequitur. Even if the Commissioner were bound to use the preexisting RUG-II methodology in complying with the mandate of the NYSAC judgment to recompute (in 1991) the reimbursement rates for rate years 1989-1991, the 1989-1991 rates so recomputed would be new rates, retroactively determined, i.e., rates never in existence or approved before 1991.
The majority apparently concedes that no specific preexisting facility Medicaid reimbursement rates set and approved without recalibration were in place for rate years 1989-1991 when the rates fixed under the recalibration regulation were overturned (see, majority opn, at 261, n 5). The majority seeks to avoid the conclusion that, therefore, any recomputation in 1991 of the 1989-1991 rates would necessarily result in new rates set retroactively, by asserting that the distinction between preexisting prospectively set and approved rates and a *272 preexisting rate-making methodology is "artificial” (id.). The majority finds such artificiality apparently because of the majority’s conviction that "[a] methodology is simply the route by which the rate is reached, and where the methodology is established the rate amount necessarily follows” (id. [emphasis supplied]).
There are several answers to these propositions. The first, and most obvious, is that, in addition to lacking support in the record, it completely defies common sense that application of such a complex and intricate rate-setting methodology as the RUG-II system would inevitably and in some mechanical fashion result, for each nursing home in the State, in a specific "rate amount” that "necessarily follows”. Second, even if this were so, the majority’s obliteration of the distinction between a preexisting rate and a preexisting rate-setting methodology necessarily proceeds under the assumption that the NYSAC judgment required the Commissioner to recompute the 1989-1991 nursing home Medicaid reimbursement rates by pure application of the RUG-II methodology without the recalibration regulations. Unless in NYSAC the Commissioner was bound upon remittal for recomputation to apply the RUG-II methodology, it cannot even arguably be claimed that a specific "rate amount [would] necessarily follow[ ]”. We have already quoted the pertinent decretal provision of the NYSAC judgment and, uncontestably, it did not dictate a methodology to be used upon recomputation. Indeed, the NYSAC judgment’s direction to the Commissioner to "recompute” the rates without reference to the recalibration regulation would have been entirely superfluous under the majority’s rationale that a preexisting rate for each nursing home was in place that "is easily identified: it is the rate that was used to calculate the 3.035% reduction” (id.).
A decree consistent with the majority’s rationale would merely have directed the Commissioner to reinstate for each nursing home "the rate that was used to calculate the 3.035% reduction” (id.). This was relief the petitioners never even sought in NYSAC. While a mere mechanical addition of 3.035% to the existing 1989-1991 rates (fixed under the recalibration regulation) was sought by the NYSAC petitioners in postjudgment litigation, and was granted by the lower courts therein (see, 191 AD2d 932 and the order quoted, supra, at n 1), surely the majority would agree that those determinations by the lower courts have no binding effect whatsoever upon this Court in the instant case. Thus, the conclusion remains *273 inescapable that, when the mandate of the NYSAC judgment became effective in 1991, the 1989-1991 rates recomputed in compliance with that judgment would be new, as never before determined, adopted and approved, and retroactive.
Indeed, it is readily apparent that petitioners’ actual objective here is not to forestall any retroactive recomputation of their reimbursement rates for the 1989-1991 rate years. Their prayers for relief in the petitions seek just such a recomputation. Rather, their purpose is to achieve complete judicial control over the Commissioner’s recomputation, not only by the imposition of the RUG-II methodology as it existed before the original recalibration regulation was promulgated, but also tying the Commissioner’s hands by limiting him to the performance of the purely ministerial act of adopting, as the new 1989-1991 rates for each nursing home, the preliminary rates that had been used in applying the recalibration regulation when the initial 1989-1991 rates were finally set and approved. As previously noted, this goes well beyond the prayer for relief in NYSAC.
Moreover, in fulfilling petitioners’ objective to eliminate totally the exercise of any judgment by the Commissioner in recomputing the 1989-1991 Medicaid reimbursement rates as directed by us in NYSAC, the majority has radically departed from New York precedents. Although Federal reimbursement rate regulation decisions support judicial imposition upon the regulatory agency of a specific prior methodology after annulment of a rate regulation (see, Bowen v Georgetown Univ. Hosp., 488 US 204; Tallahassee Mem. Regional Med. Ctr. v Bowen, 815 F2d 1435, cert denied 485 US 1020; Noland Hosp. & Clinic v Heckler, 762 F2d 1561), New York courts have, wisely in our view, eschewed directing the Commissioner how to exercise his discretion and superior expertise when a rate determination has been annulled and the proceeding remitted for redetermination (see, Matter of Society of N. Y. Hosp. v Axelrod, 70 NY2d 467, 475; Matter of Cabrini Med. Ctr. v Axelrod, 177 AD2d 824, 825, lv denied 79 NY2d 755; Matter of Brookdale Hosp. Med. Ctr. v Axelrod, 120 AD2d 144, 147-148).[3]
Thus, up to now, we would have found it unthinkable that the Commissioner, after NYSAC invalidated the original recalibration regulation, would have been prevented by the preexisting RUG-II methodology from eliminating rate infla *274 tian not attributable to the reasonable cost of efficient service, but to paper optimization, through ad hoc determinations of the 1989-1991 rates for each nursing home (see, Matter of Severino v Ingraham, 44 NY2d 763, 764).
Under the compelling circumstances presented here, we also believe that the Commissioner may accomplish the same objective through a valid recalibration regulation. First, eliminating the effects on reimbursement rates of paper optimization through ad hoc decisions would impose an overpowering administrative burden, inevitably entailing delays in reimbursements which would benefit neither the nursing home industry nor its patient population. Thus, as a practical matter, it would be virtually impossible to eliminate paper optimization without implementation of a new recalibration regulation of general applicability. The absence of a recalibration regulation applicable to the 1989-1991 rate years would, thus, defeat the paramount statutory goal of limiting Medicaid reimbursement rates to only those amounts necessary to meet the costs "incurred by efficiently and economically operated facilities” (Public Health Law § 2807 [3]). Second, the nursing home industry was on notice in December 1985, even before the effective date of the RUG-II system, that recalibration of rates might be necessary by reason of paper optimization, and, of course, the original recalibration regulation was announced only seven months after the RUG-II method went into effect. Thus, petitioners can hardly contend that they would be prejudiced by application of a new recalibration regulation because of their heavy reliance on the RUG-II methodology in its original form. In fact, for the 1989-1991 rate years, petitioners’ Medicaid reimbursement rates were set prospectively on the basis of the RUG-II method as adjusted by the voided prior recalibration regulation. The recalibration regulation under present review merely serves to fill the gap in the process of eliminating the inflationary effects of paper optimization on Medicaid reimbursement rates brought about when the prior recalibration regulation was invalidated (see, Matter of Versailles Realty Co. v New York State Div. of Hous. & Community Renewal, 76 NY2d 325, 330). Finally, the regulation challenged here adopts a cap on recalibration equivalent to the across-the-board 3.035% reduction contained in the former regulation. Thus, petitioners’ reimbursement rates will either stay the same or be greater than their rates that were set prospectively for rate years 1989-1991, the only rates for those years upon which petitioners were entitled to rely (see, *275 Matter of Brookdale Hosp. Med. Ctr. v Axelrod, 120 AD2d 144, 147-148, supra). For all the foregoing reasons, the limited retroactive application of the present recalibration regulation is not a sufficient reason to invalidate it (see, Matter of Versailles Realty Co. v New York State Div. of Hous. & Community Renewal, supra; 1 Davis and Pierce, Administrative Law Treatise § 6.6 [3d ed]; 2 Davis and Pierce, op. cit., § 13.2).
We are also unpersuaded by petitioners’ alternative contention that the recalibration regulation under review is invalid because it lacks a rational basis and is arbitrary and capricious. As previously discussed, in NYSAC, we held that the prior recalibration regulation’s across-the-board 3.035% reduction in nursing home Medicaid reimbursement rates was arbitrary and capricious in two principal respects: (1) the absence of documentation that there was even an average or mean increase of 3.035% in CMI solely attributable to paper optimization and not partly due to increased patient care; and (2) the imposition of an across-the-board percentage reduction, even to facilities that had no increase in CMIs or increases demonstrably attributable to higher levels of patient care. The regulation under review meets both objections. As previously described, the Commissioner has made a strong factual showing of the existence of paper optimization. The Commissioner also rationally identified the existence of four factors capable of producing increases in a facility’s CMI: (1) changes in the composition of its patient population because of new admissions; (2) changes in the composition of its patient population because of death or discharge of patients; (3) changes in the conditions or care needs of its patients; and (4) paper optimization. In order to isolate the increase in CMI of each facility solely attributable to paper optimization, the regulation’s methodology restricts the data base to that facility’s patients who were in residence throughout the entire 1985-1988 period of scrutiny. Thus, the regulation’s methodology effectively excludes from the equation CMI increases attributable to changes in the composition of the facility’s patient population from new admissions or death or discharge of patients. Petitioners have failed to demonstrate that it was unreasonable for the Commissioner to select the length of stay of a facility’s patients as a measurement of changes in CMI due to the remaining legitimate cause of such increases, each patient’s deterioration over time. Finally, there were valid reasons for using 1985 State-wide CMI patient averages for the various *276 categories of lengths of patients’ stay as a benchmark for comparison to the CMIs of patients of the individual facility being surveyed. As previously explained, the 1985 State-wide CMIs for the various categories of length of stay would have had the least likelihood of inflation due to paper optimization. Moreover, a given facility might not have had a sufficient number of patients in each length of stay category in 1985 to furnish a reliable CMI standard for any given length of stay period. Thus, the instant recalibration regulation focuses on the CMI data of the individual facility and employs a reasonable method of identifying that portion of that facility’s CMI increases resulting from paper optimization, by eliminating increases in the CMIs of that facility legitimately caused by changes in the service needs of the facility’s patient population. While petitioners have pointed to possible statistical imperfections in the regulation’s methodology, they have not met their heavy burden of making a compelling showing of its irrationality or lack of any factual basis (see, Matter of Catholic Med. Ctr. v Department of Health, 48 NY2d 967, 968; Matter of Sigety v Ingraham, 29 NY2d 110, 114), a conclusion supported by their failure to suggest any feasible alternative method to address the problem of paper optimization.
Finally, we also disagree with the majority’s conclusion that the Commissioner interpreted his own regulations irrationally in determining the patient days of care of petitioner Jewish Home and Infirmary of Rochester, New York, Inc. (Jewish Home) for purposes of its reimbursement calculations. When Jewish Home commenced operations in 1985, it initially received a budget based rate pursuant to 10 NYCRR 86-2.15, due to its lack of adequate cost experience to receive a cost based rate. Pursuant to former 10 NYCRR 86-2.2 (e), Jewish Home submitted a cost report for August 1, 1985 through January 31, 1986 — the first six-month period in which it had an over-all average utilization of at least 90% of bed capacity —which became the basis for calculating its rates on a cost basis.[4] In this cost report, Jewish Home reported a 99.6% occupancy rate for its SNF beds and an 82% occupancy rate for its HRF beds, for an over-all rate of 91.1%. Because Jewish Home’s reported SNF occupancy rate exceeded 90%, its SNF reimbursement rate was calculated by the Department of
*278 Health based upon the actual number of SNF patient days of care provided at the facility. Since Jewish Home’s reported HRF occupancy rate was less than 90%, however, the Department imputed a 90% occupancy rate for purposes of computing its HRF rates.
It is elemental that a commissioner’s interpretation of a regulation is "controlling and will not be disturbed in the absence of weighty reasons” (Matter of Sigety v Ingraham, 29 NY2d 110, 114, supra). We review only to assess whether the administrative determination is arbitrary and capricious; if it is not, it must be sustained (see, Matter of Cortlandt Nursing Care Ctr. v Whalen, 46 NY2d 979, 980, supra). In light of this narrow standard of review, we are unable to conclude that the Commissioner’s interpretation of the pertinent regulations to treat Jewish Home as a single facility for the purpose of determining when it should file its six-month cost report and then subdividing the facility into its SNF and HRF component parts to determine its patient days of care for reimbursement calculations is arbitrary or capricious.
We have previously sustained as rational the Commissioner’s determination to subdivide a facility into its SNF and HRF component parts for rate-setting purposes, due to the differing operational costs and services provided by each (Matter of Cortlandt Nursing Care Ctr. v Whalen, supra, at 980-981). Thus, we should likewise sustain the subdivision here unless the specific regulatory scheme concerning calculation of the residential health care facility days renders that determination irrational.
In finding a lack of rational basis for the Commissioner’s interpretation, the majority and the Appellate Division below place emphasis on section 86-2.2 (e)’s benchmark of "an overall average utilization of at least 90 percent of bed capacity” for assessing when a cost report must be filed by a new ¡ facility, and import that section’s "overall average utilization” j language into section 86-2.8 (c)’s patient days determination. However, section 86-2.8 (c) makes no reference to "overall average utilization” at the facility, but rather provides that residential health care facility days are to be determined "by I using the higher of the minimum utilization factor of 90 j percent of certified beds or the actual patient days of care as I furnished by the facility”. As only section 86-2.8 (c) specifically! addresses the determination of residential health care facility! days, section 86-2.2 (e)’s reference to "overall average utiliza-l *277 tian” does not preclude the Commissioner’s challenged interpretation of section 86-2.8 (c) here if it is otherwise rational.
In our view, the Commissioner has proffered a rational basis for treating Jewish Home as a single facility for purposes of determining when it should file its cost report under section 86-2.2 (e) and then segmenting the facility for the patient days calculations under section 86-2.8 (c). There is a strong reason to require a nursing home facility to be entirely budget based or entirely cost based; i.e., to permit one component of a facility to be budget based and the other cost based would allow the facility to manipulate its reimbursement by allocating more costs to the component operating on a cost basis, or by manipulating occupancy so that a component can continue on a budget based rate when a cost based rate may be lower. Accordingly, to prevent such manipulation, section 86-2.2 (e) provides that a facility must switch entirely to a cost based rate when its over-all occupancy is at least 90%.
However, once the facility is being reimbursed on a cost basis, it is rational to apply separate minimum utilization factors to its SNF and HRF components. As previously noted, all reimbursement rate determinations are subject to the overriding statutory requirement that such rates be "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities” (Public Health Law § 2807 [3]). Surely it is rational for the Commissioner to proceed on the premise that a facility with an unduly low occupancy rate in either its SNF or HRF beds is not conducting an efficient and economic operation, because the fixed costs of that facility’s operation will be distributed over fewer days of care. Moreover, since the rates determined utilizing the submitted cost report provide the basis for all future rates, use of the 82% HRF occupancy level would have incorporated that inefficiency into all of Jewish Home’s future HRF rates. Accordingly, when the data furnished by petitioner revealed that Jewish Home’s HRF occupancy level was at 82% — a figure comparing poorly with the State-wide average occupancy — the Commissioner was within his authority of rationally based regulatory interpretation to impute the alternative minimum utilization factor of 90% to the HRF component of petitioner’s facility. That this construction may not be the only plausible one does not render it subject to judicial nullification if it is compatible with the language of the regulation and not otherwise arbitrary and capricious (Matter of Cortlandt Nursing Care Ctr. v Whalen, supra, at 980).
*279 Accordingly, in both Matter of New York Assn. of Homes & Servs. for Aging v Commissioner of N. Y. State Dept. of Health and Matter of Jewish Home & Infirmary of Rochester v Commissioner of N. Y. State Dept. of Health, we would reverse the order of the Appellate Division and dismiss the petition.
Judges Simons, Smith and Ciparick concur with Judge Titone; Judge Levine dissents and votes to reverse in a separate opinion in which Chief Judge Kaye and Judge Bellacosa concur.
In each case: Order affirmed, with costs.

. By contrast, in the postjudgment litigation in NYSAC (see, 191 AD2d 932, Iv dismissed 82 NY2d 705, lv denied by App Div, Aug. 11, 1993), the Commissioner was ordered to "recalculate the Medicaid reimbursement rates for plaintiff's member nursing homes for the period from January 1, 1989 through December 31, 1991 so as to include an additional 3.035% in the direct component of said rates” (emphasis supplied).

. Petitioner New York Association of Homes and Services for the Aging, Inc. is a not-for-profit organization whose membership includes 264 nursing homes, all of which are owned and operated by either charitable providers or county governments. Its member nursing homes will also be referred to hereinafter as petitioners.

. The order in the postjudgment NYSAC litigation, quoted at footnote 1, supra, is inconsistent with the prevailing view.

. By amendment effective March 26, 1993, section 86-2.2 (e) now provides that a cost report must be filed by a new facility for the first 12-month period in which it has an over-all average utilization of at least 90% of bed capacity.