# Authorization of Immigration Emergency Fund Reimbursements

The continuing resolution enacted on September 30, 1995, does not limit or suspend the authority that would otherwise exist for the obligation or expenditure of an Immigration Emergency Fund reimbursement pursuant to section 404(b) of the Immigration and Nationality Act.

The Immigration Emergency Fund may be used to reimburse the State of Florida for its increase in social service and health expenses deriving from the influx of Cuban immigrants resulting from a presidential decision.

November 8, 1995

MEMORANDUM OPINION FOR THE
ASSISTANT ATTORNEY GENERAL FOR ADMINISTRATION

Section 404(b) of the Immigration and Nationality Act ("INA") established the Immigration Emergency Fund ("IEF"). *See* INA § 404(b), 8 U.S.C. § 1101 note. On September 28, 1995, President Clinton determined that an immigration emergency existed within the meaning of section 404(b) and that a $6,000,000 reimbursement should be made available from the IEF to reimburse those who assisted in the enforcement of immigration laws in connection with the repatriation of aliens interdicted en route to the United States and being smuggled by organized international syndicates. As required by section 404(b)(1), the President certified his determination to the Judiciary Committees of the House of Representatives and the Senate on October 3, 1995. On September 28, 1995, the Deputy Attorney General, addressing a separate matter, but also acting pursuant to section 404(b) of the INA, authorized an $18,000,000 reimbursement to the State of Florida.[1] On September 30, 1995, just prior to the October 1, 1995, commencement of the new fiscal year, Pub. L. No. 104–31, 109 Stat. 278 (1995) ("Continuing Resolution") was approved. The Continuing Resolution provides funds and authority to continue various government programs, operations, and activities that would otherwise have experienced a lapse in appropriations and remains in effect until November 13, 1995, at the latest.

You have asked for our opinion on two questions raised by the authorization of these reimbursements. First, you have asked whether they are prohibited from being made under the terms of the Continuing Resolution. Second, you have asked whether the terms of the IEF permit the $18,000,000 reimbursement authorized to Florida. We answer these questions in turn.

---

[1] Because the Deputy Attorney General authorized the reimbursement pursuant to section 404(b)(2)(A), a presidential determination of emergency and certification to Congress were not required. *See id.* § 404(b)(2)(C) ("[f]or purposes of subparagraph (A), the requirement of paragraph (1) that an immigration emergency be determined shall not apply"). This reimbursement was thus obligated on September 28, 1995, during fiscal year 1995.

278

## I.

The IEF is a "no year fund" — that is, Congress did not limit the appropriations it made to the IEF to a specific fiscal year or set of fiscal years, nor did it establish that the authority granted by section 404(b) would expire. Instead, Congress at irregular intervals appropriates funds to the IEF to "remain available until expended." The Administration did not submit a request for IEF funds in its fiscal year 1996 appropriations request.[2]

The act creating the IEF authorizes reimbursements in two different circumstances. When the President declares an immigration emergency and certifies that determination to the Judiciary Committees of the House and Senate, IEF funds can be used to increase border patrols or other enforcement activities of the Immigration and Naturalization Service ("INS") or to reimburse states and localities in providing assistance requested by the Attorney General. *See* INA § 404(b), 8 U.S.C. § 1101 note. The authorization to use up to $6 million of the IEF to reimburse third countries was made pursuant to this authority.

IEF funds can also be used to reimburse states and localities providing assistance to the Attorney General under certain specified conditions, or under any other circumstance determined by the Attorney General. *Id.* The authorization to use up to $18,000,000 of the IEF to make reimbursements to Florida was issued pursuant to this authority.[3]

As we understand it, there is concern that the Continuing Resolution limits or suspends the authority that would otherwise exist for the obligation or expenditure of these monies pursuant to section 404(b) of the INA. This concern rests on the belief that the Continuing Resolution prohibits all obligations or expenditures except those expressly provided for in the Continuing Resolution itself. This is a misunderstanding of the Continuing Resolution.

Many of the federal government's continuing programs, projects, and activities are funded through one of the thirteen appropriations bills that are enacted annually. Those programs, projects, and activities may only continue after the conclusion of a fiscal year if the relevant appropriations bill has been enacted for the following fiscal year.[4] On the occasions when Congress has failed to enact any or all of these annual appropriations bills by the end of the preceding fiscal year, Congress has typically enacted a continuing resolution to allow those programs that would otherwise lapse to continue until an annual appropriation is

---

[2] In 1989, Congress appropriated $35,000,000 to the IEF. *See* Pub. L. No. 101–162, tit. II, 103 Stat. 988, 1000 (1989). It did not appropriate money to the IEF again until October 1993, when it appropriated $6,000,000. *See* Pub. L. No. 103–121, tit. I, 107 Stat. 1153, 1161 (1993). Most recently, Congress appropriated $75,000,000 for the IEF in August 1994. *See* Pub. L. No. 103–317, tit. I, 108 Stat. 1724, 1732 (1994).

[3] The Deputy Attorney General is authorized to exercise all of the authority of the Attorney General. *See* 28 C.F.R. § 0.15(a) (1995).

[4] This generally applicable statement is subject to statutory exceptions, most notably those contained in the Antideficiency Act. *See* 31 U.S.C. §§ 1341–1342.

enacted. *See* 2 Office of the General Counsel, United States General Accounting Office, *Principles of Federal Appropriations Law* 8-2 (2d ed. 1992).

Under this usual practice, a continuing resolution does not apply to obligations validly incurred during the preceding fiscal year. The $18,000,000 grant to Florida was validly obligated in fiscal year 1995, and so would not be covered under a standard continuing resolution.[5] There also are programs, projects, and activities — such as the IEF — that are not dependent upon annual appropriations bills for appropriations or authority. Traditionally, continuing resolutions do not apply to these programs, projects, or activities. Of course, Congress could, if it chose, extend the coverage of a continuing resolution to include *all* programs, projects, and activities; however, we find nothing in the Continuing Resolution's text to suggest that Congress altered its usual practice in a way that affects the IEF.

We understand the contention that the current Continuing Resolution limits or suspends the authority and prior authorization otherwise applicable to the IEF to be based on section 107, which provides: "Appropriations made and authority granted pursuant to this joint resolution shall cover all obligations or expenditures incurred for any program, project, or activity during the period for which funds or authority for such project or activity are available under this joint resolution." *Id.* § 107, 109 Stat. at 280. The natural reading of this section is that it contains a term that defines the scope of coverage of the *appropriations made and authority granted* by the Continuing Resolution ("all obligations or expenditures incurred for any program, project, or activity"), as well as a term that defines the duration of the time period during which that scope of coverage applies ("during the period for which funds or authority for such project or activity are available under this joint resolution"). In addition to specifying scope of coverage and duration of coverage for programs, projects or activities for which the Continuing Resolution *does* contain appropriations and authority, however, it has also been suggested that this section applies to programs, projects or activities for which the Continuing Resolution does *not* contain appropriations or authority. In other words, the suggestion is that there is a negative implication to this section that any program, project or activity not affirmatively provided funding or authority by the Continuing Resolution is thereby denied appropriations and authority, notwithstanding any other provisions of law. Perhaps this suggestion rests in part on the belief that the use of the expression "*any* program, project, or activity" within the scope of coverage term extends the applicability of section 107 to all programs, projects or activities of the government.

As we have indicated already, this reading would be inconsistent with the usual practice and understanding of Continuing Resolutions. More importantly, it simply

---

[5] It is not clear whether the $6,000,000 reimbursement was obligated in fiscal year 1995 or 1996. The IEF requires the President to determine that an immigration emergency exists and to certify that fact to Congress. Because the President did not certify the immigration emergency to Congress until October 3, 1995, it is arguable that the $6,000,000 reimbursement was not obligated until fiscal year 1996. We need not resolve this question because, as we demonstrate *infra*, the Continuing Resolution does not apply to the IEF.

is not possible to read section 107 in a way that supports such a negative implication. Interpreting "any" in the scope of coverage term to encompass "all" government programs, so as to deny appropriations or authority to programs, projects or activities not affirmatively granted funds or authorization by the Continuing Resolution, does not produce the result of withholding authority from such programs. Instead, the duration of coverage of this section with respect to a program for which the Continuing Resolution does *not* appropriate monies or grant authority equals zero, because the "period for which funds or authority for such project or activity *are* available under this joint resolution" is zero. In other words, section 107 would have the effect of covering all obligations or expenditures for such a program for a time period of zero moments — which is tantamount to saying that the section does not cover such a program. Rather than giving the section this self-abnegating reading, it makes far more sense to understand that the limitation to programs affirmatively covered by appropriations or authorities in the Continuing Resolution that is the natural reading of the subject of the section ("[a]ppropriations made and authority granted pursuant to this joint resolution"), and that is expressed in the durational term ("for which funds or authority for such project or activity are available under this joint resolution") also applies to the phrase "any program, project or activity" in the scope of coverage term, so that the entire section is read to apply only to programs, projects or activities that are affirmatively covered by appropriations or authorities in the Continuing Resolution. Nevertheless, the operative result of the section is the same whether "any program, project or activity" is viewed as limited in this way or not: section 107 by its terms does not withdraw appropriations or authorities otherwise provided by law when those programs are not affirmatively covered by the Continuing Resolution.

Accordingly, the authorization of section 404(b) to obligate and expend available IEF appropriations would only be affected by the Continuing Resolution if some express provision of the Continuing Resolution applies to it. None does. The only two sections of the Continuing Resolution that might conceivably cover the obligations from the IEF are sections 101 and 111. Neither of these sections, however, actually does.

The Continuing Resolution provides appropriations and authority for "continuing projects or activities" covered in the appropriations bills listed in section 101. As already indicated, none of these bills authorizes or appropriates for the IEF. The Continuing Resolution also provides authority and appropriations for three categories of ongoing projects or activities in section 111, but none of these categories applies to the IEF. First, it applies "whenever an Act listed in section 101 as passed by both the House and Senate as of October 1, 1995, does not include funding for an ongoing project or activity for which there is a budget request." *Id.* § 111, 109 Stat. at 280. This category is inapplicable, as the Administration made no budget request for the IEF. Second, section 111 applies "when-

ever an Act listed in section 101 has been passed by only the House or only the Senate as of October 1, 1995 and an item funded in fiscal year 1995 is not included in the version passed by the one House." *Id.* This category does not describe the IEF, for the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriation Act, 1996, Pub. L. No. 104–134, 110 Stat. 1321, had passed both houses of Congress by October 1, 1995. Finally, section 111 applies "whenever the rate for operations for an ongoing project or activity provided by section 101 for which there is a budget request would result in the project or activity being significantly reduced." Continuing Resolution, § 111, 109 Stat. at 280. This category does not apply to the IEF both because the IEF is not covered by section 101 and because there is no budget request for the IEF. Finally, section 111 provides that "[n]o new contracts or grants shall be awarded in excess of an amount that bears the same ratio to the rate for operations *provided by this section* as the number of days covered by this resolution bears to 366." *Id.* (Emphasis added.) Because the IEF's rate for operations is not provided by section 111 or any other provision of the Continuing Resolution, but rather is provided by section 404(b) of the INA, section 111 does not apply to the IEF.

## II.

Your second question relates to an $18,000,000 allocation to Florida for that state's expenses deriving from the influx of Cuban immigrants resulting from the President's decision to "bring into the United States the Cuban population on Guantanamo and to repatriate Cuban migrants apprehended at sea in the future." Memorandum for the Deputy Attorney General, from Amy Jeffress, Special Assistant to the Deputy Attorney General at 1 (Aug. 30, 1995) ("Jeffress Memo"). Specifically, you have asked (a) whether the IEF may be used to offset the increase in social service and health care costs that Florida will bear as a result of the President's decision and (b) if so, whether the allocation may be disbursed prospectively—that is, before Florida actually has incurred the anticipated increased social service and health care expenses. For the reasons set forth below, we believe that the purposes for which the allocation is to be made are permissible under the statute and implementing regulations; however, we do not believe that the payments may be made prospectively.

## A.

In 1986, Congress established the IEF to be available in case of a presidentially declared immigration emergency. *See* Immigration Reform and Control Act of 1986, Pub. L. No. 99–603 § 113, 100 Stat. 3359, 3383.[6] Congress specifically

---

[6] Date corrected and citation added by editors.

had in mind the Mariel boatlift. *See, e.g.,* H.R. Rep. No. 99–682(I), at 65 (1986), *reprinted* in 1986 U.S.C.C.A.N. 5649, 5669. In 1990, Congress added a section permitting the Attorney General to use up to $20,000,000 to reimburse states for immigration-related expenses that were not incurred in a presidentially declared immigration emergency. Immigration Act of 1990, Pub. L. No. 101–649, §705, 104 Stat. 4978, 5087[7] (''[T]he requirement . . . that an immigration emergency be determined shall not apply.''). That section allows the Attorney General to reimburse states for their assistance to the Attorney General whenever the number of asylum claims for a calendar quarter exceeds by 1,000 the applications received in the previous quarter; the lives, property, safety, or welfare of the state's residents are endangered; or ''in any other circumstances as determined by the Attorney General.'' INA §404(b)(2)(A), 8 U.S.C. §1101 note. Congress thus expressed, and enacted, its intent to grant the Attorney General broad discretion to determine when the IEF should be used to reimburse states. Consistent with this statutory scheme, Congress authorized the Attorney General to promulgate regulations to implement the IEF and to ''delineat[e] . . . 'other circumstances.' '' *See* Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1992, Pub. L. No. 102–140, §610(b), 105 Stat. 782, 832 (1991).

Pursuant to this statutory authorization, the Attorney General has issued regulations to govern administration of the IEF and delineate the ''other circumstances'' in which the IEF will be available to reimburse states. The regulations state, ''[o]ther circumstances means a situation that, as determined by the Attorney General, requires the resources of a State or local government to ensure the proper administration of the immigration laws of the United States or to meet urgent demands arising from the presence of aliens in a State or local government's jurisdiction.'' 28 C.F.R. §65.81 (1995). The Attorney General promulgated this delineation of ''other circumstances'' along with an explanatory note in which she observed that costs such as those relating to social services and health care do not typically fall within this delineation. She also made clear, however, that ''in limited circumstances'' such services could in fact ''assist the Attorney General'' and so would be reimbursable. 59 Fed. Reg. 30,520, 30,521 (1994).

The Deputy Attorney General, who is authorized to discharge the Attorney General's functions under the IEF, *see* 28 U.S.C. §510; 28 C.F.R. §0.15(a), has determined that Florida's request represents one of the limited circumstances in which the regulations and statute allow the IEF to be used to reimburse states for the cost of social services provided to aliens. *See* Executive Summary and Request for Decision (Aug. 30, 1995). The Deputy Attorney General reached her decision after concluding that the costs Florida has borne, and continues to bear, constitute urgent assistance to the Attorney General and the federal government generally

[7] Date and citation corrected by editors. As issued in 1995, the Opinion cited Pub. L. No. 99–603, 100 Stat. 3359 (1986).

283

in implementing and enforcing federal immigration law. *See id.*; Jeffress Memo at 2–3. We defer to the Deputy Attorney General's determination.

## B.

The $18,000,000 allocation is meant to reimburse Florida for a variety of obligations, some of which apparently have not yet been incurred but which are anticipated. The regulations that the Attorney General promulgated to implement the legislation establishing the IEF provide for disbursements in the form of a "reimbursement agreement, grant, or cooperative agreement." 28 C.F.R. §§ 65.84, 65.85 (1995). Generally, we would interpret the term "grant" as encompassing payments for purposes in addition to reimbursements and including prospective payments. Regulations, however, must be interpreted in light of the statutory authority on which they are based, as a regulation may not expand the authority granted by its authorizing statute. *See, e.g., Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). In this instance, the statute establishing the IEF only provides for reimbursements. The statute ordains that, "[f]unds . . . shall be available, by application for the reimbursement of States and localities providing assistance as required by the Attorney General, to States and localities." INA § 404(b)(2)(A), 8 U.S.C. § 1101 note.

The statute thus provides only for "reimbursement." The ordinary meaning of "reimbursement" is a repayment or ex post facto compensation for an obligation already incurred. *See, e.g., Webster's Third New International Dictionary* 1914 (1993) (defining "reimburse" to mean "to pay back (an equivalent for something taken, lost, or expended) to someone"). "Reimbursement," at least in its ordinary usage, does not cover a prospective or advance payment for obligations that have not yet been incurred but which merely are anticipated. Congress, of course, may give any meaning it wishes to the terms it uses in statutes, and if it had indicated that it meant reimbursement to include prospective payments, then such payments would be permissible. *See United States v. Ron Pair Enters.*, 489 U.S. 235, 242 (1989). There is nothing in the statute or in its legislative history, however, that addresses the meaning of reimbursement generally or the specific matter of whether that term might refer to prospective payments. In contrast, there are at least thirty-four [8] statutes that create grants that can be used for either payment "in advance or by way of reimbursement." [9] We take these frequent disjunctive

---

[8] Corrected by editors. As issued in 1995, the opinion read "at least forty statutes."

[9] *See* 22 U.S.C. § 4025(a); 42 U.S.C. § 254b(d)(4)(B); 42 U.S.C. § 254c(d)(4)(B); 42 U.S.C. § 254f(b)(2)(B); 42 U.S.C. § 286b–8(a); 42 U.S.C. § 287a–2(e)(2); 42 U.S.C. § 291j–10; 42 U.S.C. § 295o(f)(1)(A); 42 U.S.C. § 300e–16(a)(4); 42 U.S.C. § 300j–9(d)(1); 42 U.S.C. § 1394; 42 U.S.C. § 3057m; 42 U.S.C. 5022; 42 U.S.C. § 6082(e); 42 U.S.C. § 6978(a); 42 U.S.C. 7601(c), 42 U.S.C. § 10904(b), 42 U.S.C. § 12651d(b)(2)(B); *see also* 21 U.S.C. § 1177(e); 25 U.S.C. § 450j(b); 25 U.S.C. § 1612(b)(2); 25 U.S.C. § 1656(b); 29 U.S.C. § 1579(c); 38 U.S.C. § 8201(d); 42 U.S.C. § 242a(c); 42 U.S.C. § 242m(e)(1); 42 U.S.C. § 626(c); 42 U.S.C. § 1310(a)(3); 42 U.S.C. § 1395b–1(a)(1)(K)(2); 42 U.S.C. § 2000c–5; 42 U.S.C. § 3029(a); 42 U.S.C. § 3037a(b); 42 U.S.C. § 5657(a); 42 U.S.C. § 9832(3).

references to reimbursement, on the one hand, and prospective payments, on the other, as strong evidence that Congress does not ordinarily understand the term "reimbursement" to include prospective payments or payment "in advance." We therefore adhere to the ordinary meaning of "reimbursement," *see Burns v. Alcala*, 420 U.S. 575, 580–81 (1975); *Banks v. Chicago Grain Trimmers Ass'n*, 390 U.S. 459, 465 (1968), and conclude that the IEF may not be used to cover prospective costs. Consequently, we interpret the term "grant" in the regulations as referring only to grants that reimburse states for obligations already incurred.

This conclusion is not at odds with the meaning or usage of the term "grant." There are at least three statutes that establish grant funds that, by their terms, are available exclusively for reimbursements. *See* 10 U.S.C. § 1152(d)(1); 20 U.S.C. § 8004(a); 49 U.S.C. § 31103. The statutes discussed above that provide for either reimbursement or payment in advance also demonstrate that reimbursement is not a payment method that is antithetical to grantmaking. This narrower construction of the term "grant" also finds support in the explanatory material accompanying the regulation, which sets forth that "[t]he rule has been amended to allow the Attorney General to use the grant or cooperative agreement process to provide funding, in addition to negotiating a separate reimbursement agreement. Accordingly, State and local governments may also use standard grant applications." 59 Fed. Reg. at 30,521 (emphasis added). By adding the term "grant" the Attorney General apparently meant to make available an additional process for seeking disbursements from the IEF and to utilize standard forms with which applicants were already familiar. All of this may be accomplished even though grants that are issued from the IEF are available to grantees only for the purpose of reimbursing obligations that grantees have already incurred. This narrower construction of grant, then, does not undermine the stated purposes of the Attorney General in allowing grants to be made from the IEF. This construction of the statutory term "reimbursement" and the regulatory term "grant" does not deny the authority of the Attorney General to commit a certain portion of the IEF for reimbursement to a state before the state has incurred obligations in the full amount. Rather, our construction merely would prohibit full disbursement of the grant amount before the recipient state has incurred obligations in the full amount of the grant.

CHRISTOPHER SCHROEDER
*Deputy Assistant Attorney General*
*Office of Legal Counsel*