**Herbert A. CADDELL, Petitioner,**

v.

**DEPARTMENT OF JUSTICE, Respondent.**

No. 95–3254.

United States Court of Appeals, Federal Circuit.

Sept. 19, 1996.

---

Ross A. Nabatoff, Brand, Lowell & Ryan (A Professional Corporation), Washington, D.C., argued, for petitioner.

Domenique Kirchner, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., argued, for respondent. On the brief were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, Kirk T. Manhardt, Assistant Director, and S. Lane Tucker, Attorney. Of counsel were James M. Kinsella and Brian M. Simkin.

Before PLAGER and SCHALL, Circuit Judges, and SMITH, Senior Circuit Judge.

PLAGER, Circuit Judge.

Petitioner, Herbert A. Caddell, seeks review of the decision of the Merit Systems Protection Board ("Board" or "MSPB"), 66 M.S.P.R. 347 (1995), which sustained the action of the Department of Justice, United

States Marshals Service ("agency"). The agency suspended Mr. Caddell for two days, reassigned him from Tampa, Florida to the Virgin Islands, and ordered him to undergo a psychiatric fitness-for-duty examination. Although the record raises more questions than it answers, we nevertheless find no reversible error in the decision of the Board, and thus we affirm.

## BACKGROUND

Mr. Caddell, a Supervisory Deputy U.S. Marshal, has been employed with the U.S. Marshals Service since 1971. In 1987 he was assigned to work in the Tampa office of the U.S. Marshals Service for the Middle District of Florida, the district office run by then U.S. Marshal Richard Cox. By early 1988 Caddell became aware of what he considered improper conduct by Marshal Cox, and began reporting Cox's activities to officials in the U.S. Marshals Service. Unsatisfied with the response, he subsequently, in July 1989, contacted the U.S. Attorney's Office in Tampa about the matter. In a report on Cox's conduct later issued by the Justice Department's Office of Inspector General, Caddell was identified as having provided information about Cox to the Inspector General.

Meanwhile, as a consequence of Cox's activities and management of the office, personnel relations in the Tampa office became quite difficult, with two factions contending with each other. The agency's ability to deal with the problem was complicated by the fact that it did not have authority to remove Cox since he was a Presidential appointee. Cox resigned effective October 19, 1990, after he was told that the agency would seek his removal by the White House.

Subsequently, in the course of cleaning up the mess in the Tampa office, the agency took a number of actions affecting the various personnel who were there during the Cox administration. In 1991, Caddell filed an individual right of action appeal with the MSPB, alleging that three actions taken in regard to him were taken by the agency in retaliation for his whistleblowing: (1) directing him to undergo a psychiatric fitness-for-duty examination; (2) suspending him for two days following a confrontation with Cox; and (3) reassigning him to the Virgin Islands.

Caddell appeals from the fourth Board decision in this case. On three occasions, the Board vacated the decision of the administrative judge ("AJ") dismissing Caddell's individual right of action appeal, on the basis that the AJ did not make all of the required findings and conclusions, apply the correct evidence standard, or make proper credibility determinations. Despite the fact that the AJ failed to comply with the Board's repeated instructions, and continued improperly to dismiss Caddell's complaint, the Board in its fourth decision held that the AJ's remaining errors did not constitute reversible error, and affirmed the initial decision dismissing Caddell's appeal.

## DISCUSSION

In reporting Marshal Cox's improper conduct to the U.S. Attorney's Office in Tampa, Mr. Caddell clearly engaged in the type of whistleblowing intended to be encouraged and protected by the Whistleblower Protection Act, Pub.L. No. 101–12, 103 Stat. 16 (1989) (codified as amended in scattered sections of 5 U.S.C.) ("WPA"). The Board nevertheless arrived at the conclusion that the agency's treatment of Caddell did not entitle him to relief under the WPA.

As to the two-day suspension, the Board noted that Caddell committed misconduct by engaging in a loud confrontation with Cox. The decision by the agency to punish Caddell was made by two other agency officials independently of Cox, and the case was ultimately decided against Caddell by an independent adjudicator assigned by the agency's grievance process. (As a result of the grievance filed by Caddell the suspension was reduced from seven days to two days.)

With regard to Caddell's reassignment to the Virgin Islands, the Board held that the AJ erred in concluding that whistleblowing was not a contributing factor. However, the Board held that this was harmless error because the AJ correctly determined that the agency proved by clear and convincing evidence that it would have reassigned Caddell in the absence of his disclosure. The Board

evaluated the strength of the agency's evidence in support of its personnel action, the existence and strength of any motive to retaliate, and evidence that the agency, as part of its cleanup of the Tampa office situation, reassigned three other employees, including Chief Deputy Frank Dumaine, who were not whistleblowers.

Finally, the Board held that it lacked jurisdiction over Caddell's claim pertaining to the agency's order for him to undergo a fitness-for-duty examination because it was not a "personnel action" within the meaning of the WPA, 5 U.S.C. § 2302(a)(2).

■ Regarding the two-day suspension, our standard of review requires us to affirm a Board decision if there is substantial evidence in the record to support it. 5 U.S.C. § 7703(c) (1994). The record fully sets forth the facts surrounding the altercation between Cox and Caddell, and the decisional process that ensued. We cannot say that there is an absence of substantial evidence supporting the Board's conclusion that Caddell, despite the obvious provocation, acted in a manner not appropriate to his position.

■ Similarly, the Board's conclusion that the agency's reassignment of Caddell would have occurred even in the absence of the whistleblowing can only be overturned by us on this record if it is without substantial evidence in support of it, or the conclusion is arbitrary or capricious or otherwise not in accordance with law. *Id.* As noted, the Board examined the evidence in detail, and judged it sufficient to establish by clear and convincing evidence that the agency had not acted in violation of the WPA. We cannot say the Board's decision falls short in any respect under our standard of review.

■ With regard to the question of the fitness-for-duty psychiatric examination, although Congress recently amended the WPA to include as a "personnel action" a decision to order psychiatric testing or examination, Act of October 29, 1994, Pub.L. No. 103–424, § 5, 108 Stat. 4361, 4363 (codified at 5 U.S.C. § 2302(a)(2)(A)(x)), the Board correctly held that this amendment did not apply to cases pending before the Board on the date of enactment.

The Act states that "the amendments made by this Act shall be effective on and after the date of the enactment of this Act," which was October 29, 1994. Pub.L. No. 103–424, § 14, 108 Stat. at 4368. The amendments clearly apply to conduct that occurs after the date of enactment. The conduct charged in this case occurred several years prior to that date. Thus the question raised is whether the Board should have applied the law in effect at the time the conduct occurred, or at the time of its decision in January 1995. The Board, citing *Landgraf v. USI Film Products*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), concluded that "the 'traditional' presumption against applying a statute retroactively should be applied here." 66 M.S.P.R. at 354.

In *Landgraf,* the Supreme Court dealt with a provision of the Civil Rights Act of 1991, which amended Title VII of the Civil Rights Act of 1964, and that, like the amendments here, simply specified that the act shall take effect upon enactment, without addressing the question of retroactivity. The Court addressed the tension, highlighted by Professor Llewellyn in several of his notable writings, between the canon of construction that calls for a court to apply the law in effect at the time it renders its decision, and the canon that states that retroactivity is not favored in the law, the latter carrying the interpretive corollary that "congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." *Landgraf,* —— U.S. at ——, 114 S.Ct. at 1496 (quoting *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988)). In a lengthy exposition about the history and policy of judicial treatment of retroactivity of Congressional enactments, the Court dealt with a wide-ranging set of issues, including the question of impact on property and contract rights, on jurisdiction of courts, and on elementary considerations of fairness so that individuals should have an opportunity to know what the law is and to conform their conduct accordingly.

The Court came down four-square for the proposition that, even in an era when "legislation has come to supply the dominant

means of legal ordering, and circumspection [about applying legislation retroactively] has given way to greater deference to legislative judgments," *id.* at ——–——, 114 S.Ct. at 1500–01, this "d[oes] not alter the well-settled presumption against application of the class of new statutes that would have genuinely 'retroactive' effect," *id.* at ——, 114 S.Ct. at 1503. Courts were instructed to determine

> whether the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

*Id.* at ——, 114 S.Ct. at 1505.

If we apply the amendment to the present case, the statute *would* have retroactive effect. Prior to this amendment, an employee ordered to undergo a psychiatric examination could not challenge the order as a violation of the WPA. Since the amendment, an employee may file an action to so challenge. Consequently, the amendment clearly imposes new duties on government officials wishing to utilize fitness-for-duty examinations, since they now must ensure that such examinations are consistent with any circumstances implicating whistleblowing activity, and arguably the amendments could increase a government official's liability for past conduct.

Furthermore, there is nothing in the statute, or legislative history of the amendments to the extent that is relevant, that suggests a Congressional intent to apply the amendment retroactively. The language of the statute does not state that it should be applied retroactively. The legislative history of the statute does not elaborate on the statutory language, stating that "the amendments made by the bill become effective on and after the date of enactment." S.Rep. No. 358, 103d Cong., 2d Sess. 12 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3549, 3561.

Mr. Caddell argues that the presumption against retroactivity should not be applied in this case for two reasons. First, he notes that the House Bill contained a provision that precluded retroactive application of the amendment. The House Bill provided: "No provision of this Act shall affect any administrative proceeding pending at the time such provision takes effect. Orders shall be issued in such proceedings and appeals shall be taken therefrom as if this Act had not been enacted." H.R. 2970, 103d Cong., 2d Sess. § 10 (1994). Caddell argues that the fact that the final bill that became law did *not* contain this express preclusion indicates that Congress agreed that the amendments should apply to all cases pending as of October 29, 1994. Second, Caddell argues that the amendment confers jurisdiction on the MSPB, and therefore falls within the jurisdiction exception, noted in *Landgraf,* —— U.S. at ——–——, 114 S.Ct. at 1501–02, to the presumption against retroactivity.

We disagree. The deleted provision demonstrates that Congress can unambiguously specify the retroactive effect of legislation if it decides to do so. Congress easily could have modified the deleted provision to indicate that "the Act shall control any administrative proceeding pending at the time such provision takes effect." Congress failed to do that in this case and we will not read this language into the statute. Further, the amendment does not merely affect jurisdiction. On the contrary, it "attaches new legal consequences to events completed before its enactment," *Landgraf,* —— U.S. at ——, 114 S.Ct. at 1499, by enlarging the category of conduct subject to the WPA. Consequently, we hold that the presumption against statutory retroactivity applies in this case, and we affirm the Board's conclusion declining to apply the amended version of 5 U.S.C. § 2302.

Despite our affirmance of the Board's final decision in this long-running dispute, we would be remiss if we did not acknowledge, as we did in oral argument, that this case has several disturbing aspects. It is true that, as a matter of the technical application of the WPA, Caddell failed to prove to the Board's satisfaction that the agency took any personnel action in retaliation for whistleblowing. And, given our statutory standard of review over Board decisions, we are left with little

choice but to affirm the Board's decision. To arrive at that conclusion, however, the Board found it necessary to repeatedly remand the matter to the AJ, who persisted from the beginning in dismissing Caddell's claim despite repeated errors in the analysis of the issues. And despite these problems in the record, the agency persisted in its prosecution of its side of the case.

The record further suggests that, given the general discord in the Tampa office as amply documented by the Inspector General, and particularly the understandably strained relationship between Caddell and Marshal Cox, a more responsive handling of the situation by the agency, responsive to the values that inhere in the WPA, may have been appropriate. Caddell clearly carried out the responsibilities intended by the Act, and the Government benefited by his actions. That there was bad blood between him and the supervisor about whom he was whistleblowing should not be thought surprising. The purpose of the WPA is not merely to give an employee technical defenses to overt acts of retribution, but to create an atmosphere within government agencies favorable to the disclosure and correction of improper and illegal acts, especially when they are acts of management officials. *See* WPA, Pub.L. No. 101–12, § 2(b), 103 Stat. 16 (stating that one "purpose of this Act is … to help eliminate wrongdoing within the Government"). In such cases the inevitable strains created within an organization while the improper conduct of supervisors is corrected may result in aberrant behavior, the treatment of which requires considerable sensitivity by senior management. Courts alone cannot ensure the values expressed by Congress in its enactment of the WPA; the pursuit of justice must be a shared endeavor.

## CONCLUSION

We are compelled on the record before us to conclude that Caddell has not met his burden of proving that the Board's decision was arbitrary, capricious, an abuse of discretion, procedurally incorrect, unsupported by substantial evidence, or otherwise not in accordance with law. *See* 5 U.S.C. § 7703(c) (1994). Accordingly, we affirm the Board's decision.

## COSTS

Each party to bear its own costs.

*AFFIRMED.*