**UPPER CHATTAHOOCHEE RIVERKEEPER FUND, et al., Plaintiff,**

v.

**The CITY OF ATLANTA, Defendant.**

**The United States of America and The State of Georgia, Plaintiffs,**

v.

**The City of Atlanta, Defendant.**

**Nos. Civ.A.1:95CV2550TWT, Civ.A.1:98CV1956TWT.**

United States District Court, N.D. Georgia, Atlanta Division.

May 30, 2000.

§ 1367(c) to remand a case after all causes of action over which the court had original jurisdiction have been dismissed).

David H. Pope, Carr Tabb Pope & Freeman, Atlanta, GA, for Upper Chattahoochee Riverkeeper Fund, Inc., Chattahoochee Riverkeeper, Inc., W. Robert Hancock, Jr., Jack Baytos, Troup County, City of West Point, City of Lagrange, Lagrange–Troop County Chamber of Commerce, Heard County, City of Hogansville, Harris County, Lake Harding Ass'n, plaintiffs.

William A. Weinischke, phv-USDOJ, Lois J. Schiffer, phv-USDOJ, U.S. Department of Justice, Environment & Natural Resources Division, Environmental Enforcement Section, Washington, DC, for USA, plaintiff.

Brenda H. Cole, State of Georgia Law Department, Atlanta, GA, Robert S. Bomar, Lee Ann de Grazia, John E. Hennelly, Office of State Attorney General, Atlanta, GA, for State of Georgia, plaintiff.

Richard Allen Horder, Newton G. Quantz, III, Kilpatrick Stockton, Atlanta, GA, for City of Atlanta, defendant.

Susan Barker Forsling, Susan M. Hartwig, Vernitia Averett Shannon, Office of Fulton County Attorney, Fulton County Government Center, Atlanta, GA, for Fulton County, proposed intervenor.

## ORDER

THRASH, District Judge.

These are consolidated actions brought by the Upper Chattahoochee Riverkeeper Fund, the United States of America and the State of Georgia against the City of Atlanta regarding the City's waste water collection and treatment system. The actions are brought pursuant to Section 309 of the Clean Water Act, 33 U.S.C. § 1319. The Plaintiffs contend that the City is illegally discharging pollutants and is violating the conditions set forth in the National Pollutant Discharge Elimination System ("NPDES") Permits issued to it by the Georgia Department of Natural Resources, Environmental Protection Division ("EPD"). Pursuant to the parties' agreement, the Court entered a Consent Decree on September 24, 1998, regarding short term and long term remedial measures to be taken by the City in order to eliminate the continuing violations of the Clean Water Act by the City's operation of a combined sewer overflow system as a part of its waste water collection and treatment system. The Consent Decree provided for the payment of stipulated penalties to be paid by the City in the event of certain occurrences. Before the Court is Defendant's Petition for Review of Stipu-

lated Penalties [Doc. 138 & 31].[1] A hearing and status conference on the matter was held on May 11, 2000. After carefully considering the arguments made in open court and in the parties' briefs, the Petition must be denied for the following reasons.

## I. BACKGROUND

The Consent Decree imposes specific obligations on the City and sets forth stipulated penalties for failing to meet those obligations. One of those obligations is preventing "dry weather overflows" into the City's combined sewer system. On two occasions in July, 1999, the City experienced overflows during dry weather into the combined sewer system that caused discharges of several million gallons of partially treated sewage into tributaries of the Chattahoochee River. It is undisputed that both overflows occurred and that they occurred during dry weather. Consequently, the EPD assessed stipulated penalties against the City in the amount of $20,000 for each occurrence. This Petition challenges the imposition of those penalties on two grounds. First, the City contends that the *force majeure*[2] clause in the Consent Decree excuses it from paying penalties for both overflows. Second, the City contends that one of the discharges was not a dry weather overflow. The Consent Decree gives this Court exclusive jurisdiction to resolve all disputes regarding assessments of stipulated penalties.

The first overflow at issue occurred on July 25, 1999. Two days prior to the overflow, on July 23, 1999, the City alleges that private contractors working for AT & T nicked a water line while installing fiber optic cable beneath John Wesley Dobbs Avenue. The contractors reported the incident to United Water, the contractor managing the City's drinking water system. An inspector dispatched by United Water viewed the damage, determined it to be minimal, and suggested a more thorough inspection in a few days. Two days later, the damaged 20–inch water main burst. Water flowed from the ruptured main into the combined sewer system which exceeded the sanitary sewer system's capacity. The excess water and sewage was diverted to the Clear Creek CSO Treatment Facility. Approximately 2.8 million gallons of water containing partially treated sewage was discharged into Clear Creek over a four-hour period.

A second overflow occurred on July 28, 1999. Four days prior to this overflow, the Tanyard Creek CSO basin received approximately 0.18 inches of rain. On July 28, 1999, City personnel were monitoring flow levels in the combined sewer system during a maintenance project at the Hemphill Water Treatment Plant. They noticed a spike in flow levels in the Orme Street Trunk Sewer. An investigation to determine the source of the increased water flow led to the Atlantic Steel property upstream from the Orme Street Trunk Sewer. The investigation revealed that Atlantic Steel personnel had removed a 15 foot long log that had plugged a spillway to a wet well. When not plugged, the spillway allowed a slow release of stormwater collected in a pond located on the Atlantic Steel property. The log had prevented the gradual runoff of the stormwater from four days earlier; removing the log caused a sudden spike in water flow into the Orme Street Trunk Sewer. When this increased water flow exceeded the sanitary sewer's capacity, the overflow of water and sewage was diverted to the Tanyard Creek CSO Treatment Facility. Approximately 238,000 gallons of water containing partially treated sewage was discharged into Tanyard Creek over a period of approximately two hours.

---

**1.** The first docket number relates to Civil Action File No. 95–CV–2550–TWT and the second to Civil Action File No. 98–CV–1956–TWT.

**2.** A fancy term for "it ain't my fault."

The City notified the EPD and the United States Environmental Protection Agency ("EPA") about both overflows. In its notification, the City contended that both incidents resulted from acts of third-parties beyond its control. Consequently, the City argued that under the Consent Decree's *force majeure* clause it should be excused from stipulated penalties. The City also contended that the Tanyard Creek overflow resulted from stormwater and thus, did not constitute a dry weather overflow as defined in the Consent Decree. EPD/EPA rejected the City's arguments and assessed a stipulated penalty of $40,-000 pursuant to Paragraph XI.G of the Consent Decree: $20,000 for each dry weather overflow. As provided in the Consent Decree, the City invoked the informal dispute resolution procedure. The parties were unable to agree on a resolution of the dispute and it was submitted to the Court by the City's Petition for Review [Doc. 138 & 31].

## II. DISCUSSION

### A. FORCE MAJEURE

██ Paragraph XII.A of the Consent Decree defines *force majeure* as any event arising from causes beyond the control of the City or any entity employed by the City which delays or prevents the performance of any obligation under this Consent Decree. The City contends that the *force majeure* clause excuses the City from paying stipulated penalties for both overflows. Because agents of AT & T and Atlantic Steel caused, at some level, the Clear Creek and Tanyard Creek overflows, the City contends those overflows were beyond its control and subject to the *force majeure* clause. The City acknowledges that a dry weather overflow in the combined sewer system is a violation of the NPDES Permits, and that the City is strictly liable for any condition that violates the Permits. It takes the position, however, that the government Plaintiffs must initiate an independent enforcement action in order to avoid the *force majeure* clause in the Consent Decree.

The City's position is inconsistent with the language of the Consent Decree and with the Court's understanding of the intent of the parties at the time of its entry. The language of the *force majeure* clause suggests that it was intended to apply principally to delays in the performance of the remedial measures required by the Consent Decree. Paragraph XII(C) of the Consent Decree provides that the City may notify EPD, EPA and the citizen Plaintiffs if it contends that "circumstances are occurring or have occurred which may delay the completion of any requirement of this Consent Decree ..." If the City contends that the delay is due to a *force majeure* event, the notice "shall describe in detail the basis for the Defendant's contention that it experienced a *Force Majeure* delay, the anticipated length of the delay, the precise cause or causes of the delay, the measures taken or to be taken to prevent or minimize the delay, and the timetable by which those measures will be implemented." If the EPA/EPD finds that "a delay in performance is, or was caused by a *Force Majeure* event, it shall extend the time for performance, in writing, for a period to compensate for the delay resulting from such event and stipulated penalties shall not be due for such period." The Consent Decree defines *force majeure* as "an event arising beyond the control of the Defendant or any entity employed by the Defendant, including, but not limited to, its consultants and contractors, which delays or prevents the performance of any obligation under this Consent Decree, despite the Defendant's best efforts to fulfill the obligation." On the other hand, the Consent Decree explicitly provides that it does not include "a failure to achieve compliance with the NPDES permits, the Georgia Water Quality Control Act, or the Clean Water Act."

The parties entered into the Consent Decree after the Court granted summary judgment in favor of the citizen Plaintiffs

with respect to their claim that the City's operation of its combined sewer system resulted in many undisputed, ongoing and massive violations of the NPDES permits, the Georgia Water Quality Control Act and the Clean Water Act. *Inter alia,* the Consent Decree established a schedule for the completion of short term and long term remedial measures to eliminate this source of pollution to the Chattahoochee River and to bring the City's sewer system into compliance with the Georgia Water Quality Control Act and the Clean Water Act. The interests of the City and the public are not disserved by allowing the City to assert a *force majeure* defense to delays in implementing remedial measures that are caused by forces beyond its control. Consistent with this, for example, the City invoked the *force majeure* clause with the approval of the EPD/EPA when completion of the Disinfection Optimization Study was delayed due to lack of rainfall in the Summer of 1998. (Quarterly Consent Decree Status Report, January, 2000, through March, 2000, p. 3.)

The City also agreed to pay stipulated penalties upon the occurrence of certain events. Stipulated penalties are assessed for the City's failure to comply with the schedule for completion of remedial measures. Stipulated penalties are also imposed for acts that in themselves are violations of the NPDES Permits and the Georgia Water Quality Control Act and the Clean Water Act, such as exceeding certain fecal coliform levels, exceeding certain limits for metals and the occurrence of dry weather overflows. The Court approved the Consent Decree with the understanding that the City would be strictly liable for payment of the stipulated penalties in the event that these violations of the NPDES Permits occurred. One important purpose of the Consent Decree was to avoid the necessity for repeated en-

forcement actions and protracted litigation every time the City's CSO system violated the permits during this interim period while the remedial measures are being implemented. The Court approved the Consent Decree with the understanding that it would establish a comprehensive remedial *and* enforcement program to ensure ultimate compliance with the Clean Water Act. With respect to serious violations of the permits, such as dry weather overflows, the public interest would not be served by allowing the City to assert a *force majeure* defense with respect to the stipulated penalties.

It is beyond the power of the Court to remedy overnight a problem that was decades in the making. It is possible, however, to give the City every incentive to eliminate avoidable discharges of inadequately treated sewage from the CSOs. The Clear Creek discharge could have been avoided if the City's contractor had taken prompt effort to fix the damaged water line. Imposing strict liability for stipulated penalties will give the City the incentive to see that its contractors exercise the utmost care to prevent dry weather overflows. Finally, the increasing scale of penalties for dry weather overflows based on the frequency of such events in the preceding 12 month period makes little sense if it takes an independent enforcement action to determine whether the City is responsible.

The Defendant argues that this interpretation of the Consent Decree deprives it of the right to have an assessment of the factors set forth in 33 U.S.C. § 1319(d)[3] in an independent enforcement action before it can be assessed monetary penalties. The argument is correct, but does not advance the Defendant's cause. Those factors are presumably factored into the amount of the stipulated penalties. The

---

**3.** "In determining the amount of a civil penalty the court shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith ef-

forts to comply with the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require." 33 U.S.C. § 1319(d).

whole point of having stipulated penalties for the types of NPDES permit violations identified by the Court in its summary judgment order and by the EPA/EPD in their independent investigation was to avoid the necessity for independent enforcement actions each time such violations occurred in the future. The possibility of cataclysmic natural disasters such as that relied upon by the City in oral argument does not justify a major gutting of the Consent Decree as an effective instrument for penalizing and preventing additional pollution of the Chattahoochee River. EPA/EPD have not shown that they lack prosecutorial discretion to respond appropriately to such a cataclysmic event. Accordingly, for all of these reasons, the *force majeure* clause does not apply to stipulated penalties for any dry weather overflows. It is undisputed that the Clear Creek discharge was a dry weather overflow. There is a dispute as to whether the Tanyard Creek overflow was such an event.

## B. *DRY WEATHER OVERFLOW.*

▆ The City contends the water that caused the Tanyard Creek overflow was stormwater. This water collected in the Atlantic Steel holding pond during the rainfall of July 24, 1999. Four days later, when the Atlantic Steel employees removed the obstructing log from the spillway, the water suddenly flowed into the sewer system. Because the water causing the overflow was largely from the rainfall four days prior, the City contends the Tanyard Creek overflow was not a dry weather overflow. In Paragraph XI.G, the Consent Decree provides that "[a]ny Dry Weather Overflow from a CSO Control Facility shall subject the [City] to the following penalties payable to the State of Georgia: ... $20,000 for a Dry Weather Overflow at a CSO Control Facility if the overflow has occurred more than twelve (12) months since the last Dry Weather Overflow at that facility...." The Consent Decree defines a dry weather overflow as "the flow in a combined sewer that results from domestic sewage, groundwater infiltration and industrial wastes with no contribution from stormwater ..." The City relies on the definition of stormwater from federal regulations which the State has adopted. *See* 40 C.F.R. § 122.26; DNR Rule 391–3–6–.16(2). These regulations define stormwater as "storm water runoff, snow melt runoff, and surface runoff and drainage." The City interprets this definition as lacking any temporal element. Thus, stormwater which collects and is later released would still be classified as stormwater. The definition of stormwater propounded by the EPA and EPD includes a temporal restriction.[4] According to the government Plaintiffs, water released from a stormwater detention pond three days after it rains is no longer stormwater.

The City relies upon various usages of the term "stormwater" in the context of other regulatory schemes such as the prevention of construction site runoff. It seems to the Court that the term "stormwater" in the Consent Degree must be given the meaning that most effectively advances the goals of remediation and enforcement that were foremost in the minds of the parties and the Court when the decree was approved. The City is stuck for now with an ancient combined sewer

---

4. Generally, courts must "defer to any reasonable EPA construction of its enabling statutes." *Texas Mun. Power Agency v. Administrator of U.S. EPA*, 836 F.2d 1482, 1488 (5th Cir.1988) (citing *Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965)). Likewise, Georgia rules of statutory construction require "great deference, unless clearly erroneous" to the enforcing administrative agency's interpretation of a statute or regulation. *Sultenfuss, et al. v. Snow, et al.*, 35 F.3d 1494 (11th Cir.1994). This rule does not apply, however, to agency litigation positions not grounded in regulations or longstanding policy. *Bowen v. Georgetown University Hosp.*, 488 U.S. 204, 212, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) ("We have never applied the principle of those cases to agency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice.")

system that discharges inadequately treated sewage into tributaries of the Chattahoochee River when it rains. The City cannot command the heavens not to allow rain to fall over Atlanta. Nevertheless, once the rain has stopped, and stormwater has been collected and stored, it is then subject to human direction. The discharge of large quantities of such water which results in diversion of sewage into the CSOs is preventable. Strict liability upon the City for any such discharges furthers the remediation and enforcement goals of the Consent Decree. For example, it may encourage the City to identify other property owners in the CSO drainage area that have detention ponds which, if not maintained properly, will result in additional dry weather overflows and pollution of the Chattahoochee River. Stormwater that is released from a detention pond four days after the rainfall is not stormwater as that term is used in the Consent Decree, and any such discharge is a dry weather overflow if it causes diversion of sewage to a CSO.

### III. CONCLUSION

For the foregoing reasons, the Court concludes that the stipulated penalties were properly assessed. Accordingly, the Petition for Review of Stipulated Penalties [Doc. 31 & 138] is DENIED. The Court hereby ORDERS the City of Atlanta to pay the sum of $40,000 in stipulated penalties as provided in the Consent Decree.